# NORTON *v.* SHELBY COUNTY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

Argued March 24, 25, 1886.—Decided May 10, 1886.

This court follows the decisions of the highest court of a State, in construing the Constitution and laws of the State, unless they conflict with or impair the efficacy of some principle of the Federal Constitution, or of a Federal statute, or a rule of commercial or general law.

The decisions of State courts on questions relating to the existence of its subordinate tribunals, and the eligibility and election or appointment of their officers, and the passage of its laws are conclusive upon Federal courts.

Following the decision of the highest court of the State of Tennessee in *Pope* v. *Phifer*, 3 Heiskell, 691, and other cases, this court holds that the Board of Commissioners of Shelby County, organized under the Act of March 9, 1867, had no lawful existence; that it was an unauthorized and illegal body; that its members were usurpers of the functions and powers of the justices of peace of the county; that their action in holding a county court was void; and that their acts in subscribing to the stock of the Mississippi River Railroad Company and issuing bonds in payment therefor were void.

While acts of a *de facto* incumbent of an office lawfully created by law and existing are often held to be binding from reasons of public policy, the acts of a person assuming to fill and perform the duties of an office which does not exist *de jure* can have no validity whatever in law.

An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.

The action of a minority of the justices of the peace of the County Court of Shelby County, Tennessee, prior to May 5, 1870, did not operate as a ratification by the County Court of the previously invalid subscription of the county to stock in the Mississippi River Railroad Company: and on and after that day, on which the new constitution of Tennessee took effect, no ratification could be made without previous assent of three fourths of the voters of the county.

This suit was brought to enforce payment of twenty-nine bonds for $1000 each, issued by the Board of Commissioners of Shelby County, in payment of a subscription by the county to stock in the Mississippi River Railroad Company. The form of the bond appears in the opinion of the court, *post* p. 434.

On the 25th February, 1867, the County Court of any county through which that railroad might run, was authorized to subscribe to its capital stock. Laws of 1866–7, page 131, ch. 48, § 6; *

---

* Sec. 6. *Be it further enacted*, That the county court of any county through which the line of the Mississippi River Railroad is proposed to run, a majority of the justices in commission at the time concurring, may make a corporate or county subscription to the capital stock of said railroad company, of an amount not exceeding two thirds of the estimated cost of grading the road-bed through the county and preparing the same for the iron rails; the said cost to be verified by the sworn statement of the president or chief engineer of said company. And after said subscription shall have been entered upon the books of the railroad company, either by the chairman of the county court, or by any other member of the court appointed therefor, the court shall proceed without further reference or delay, to levy an assessment on all the taxable property within the county, sufficient to pay said subscription; and the same shall be payable in three equal annual instalments, commencing with the fiscal year in

which power was enlarged November 5, 1867, Private Acts 1867–8, 5.*

On the 7th day of the following March the legislature reorganized the City of Memphis, and enacted that the powers theretofore vested in the Quarterly Court should be vested in a Board of Commissioners created by that act. Acts of 1867–8, ch. 46, §§ 21, 25.†

This act was subsequently held by the Supreme Court of Tennessee to be unconstitutional and invalid, and the Board created by it to have had no legal existence. The board, however, before it was so held had organized, and had performed the functions of the County Court until November, 1869; and among other things had subscribed in the name of the county to stock of the Mississippi River Railroad Company, and had issued bonds in payment therefor, of which bonds those in suit were part. It had received certificates of stock in

---

which said subscription shall be made. And it shall be lawful for county courts making subscriptions as herein provided, to issue short bonds to the railroad company, in anticipation of the collection of the annual levies, if thereby construction of the work may be facilitated ; and in all other respects, except as herein specially provided, the capital stock of said railroad company to be subscribed by counties, shall be governed by the general internal improvement laws of the State.

* " The subscription authorized . . . to be made to the capital stock of the Mississippi River Railroad Company may be made at any monthly term the county courts of said counties, or at any special term of said courts : *Provided* that a majority of all the justices in commission shall be present, and a majority of those present shall concur therein."

† Sec. 21. *Be it further enacted,* That there shall be established in the county of Shelby, in this State, a Board of County Commissioners, to consist of five persons, etc.

   *   *   *   *   *   *   *

Sec. 25. *Be it further enacted,* That all the powers and duties which are now vested in and performed by the quarterly court of said county, shall be vested in the said board of commissioners ; and in addition to the power now conferred by law, shall have authority . . . to subscribe stock to railroads which the county court of Shelby county has been authorized by general or special laws to subscribe, and under the same conditions and restrictions ; and to represent such stock in all elections for directors, and to provide for the payment of subscription as made.

   *   *   *   *   *   *   *

exchange for its bonds, and had and has since exercised its rights as a stockholder.

Before the Board of Commissioners abdicated they ordered taxes to be levied to pay these bonds, and the justices of the peace, upon resuming functions, received the money collected on the tax and paid the interest on the bonds, and paid the principal bonds maturing. This was continued, and thus a large amount of interest has been paid on the bonds, and a large part of the principal has also been paid, since the County Court resumed its functions.

On the 5th May, 1870, a new Constitution came into force in Tennessee, which contained the following provisions: "But the credit of no county, city or town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three fourths of the votes cast at said election; nor shall any county, city or town become a stockholder with others in any company, association or corporation, except upon a like election and the assent of a like majority."

"All laws and ordinances now in force and in use in this State, not inconsistent with the Constitution, shall continue in force and use until they expire or be altered or repealed by the Legislature. But ordinances contained in any former Constitution or schedule thereto are hereby abrogated."

A large part of the payments of principal and interest above referred to was made after this Constitution came into force.

The court below ordered a verdict for the county, and from the judgment entered on such verdict this writ of error was taken.

*Mr. Joseph H. Choate* for plaintiff in error.

I. That provision of the 25th section of the Act of March 9, 1867, creating the County Commissioners of Shelby County, by which, in addition to vesting in them the powers and duties vested in the Quarterly Court of the county, they were expressly and specifically authorized, among other things, " to subscribe to stock in railroads, which the County Court of Shelby County

has been authorized by general and special law to subscribe, and under the same conditions and restrictions, and to represent such stock in all elections of directors, and provide for payment of subscriptions as made," was constitutional and valid, even though in deference to the subsequent decision of the Supreme Court of Tennessee, the first clause of the section should be condemned as unconstitutional and void. And the proposition here stated has not been passed upon or considered by any court of that State, but is an original question to be determined here and now.

The well-settled rule is that although parts of an act, or, indeed, most of the provisions of it, be unconstitutional, because beyond the scope of legislative power to enact, yet that other provisions in the same act, which are clearly within the power of the legislature to enact, and are severable from the rest, may and must be saved from the judicial condemnation.

The crucial point is, are they separable? *Bank of Hamilton* v. *Dudley,* 2 Pet. 492; *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Allen* v. *Louisiana,* 103 U. S. 80; *Poindexter* v. *Greenhow,* 114 U. S. 270; *Presser* v. *Illinois,* 116 U. S. 252; *People* v. *Briggs,* 50 N. Y. 553; *Hagerstown* v. *Deckert,* 32 Maryland, 369. Viewed in the light of this principle, the provisions of § 25 of the Act of March 9, 1867, by which, after completely vesting in the Board of Commissioners the entire powers which inhered in the County Court, it proceeded to confer upon the Commissioners, *in addition,* certain express powers, which were not, by the Constitution, vested in that court—powers neither judicial nor legislative in their character, but purely administrative, respecting the business affairs of the county—and among the rest " to subscribe stock to railroads," &c., may well be sustained as constitutional, although the first clause of the section, which attempts to substitute the commissioners in the place of the justices of the peace as judges of the County Court, be condemned. These additional provisions are neither conditional nor dependent upon the first clause, nor is the first clause conditional or dependent upon them.

The court will not fail to observe that here is an act of more than forty sections, making a radical change in the affairs of

the county, and only the first clause of § 25 has been challenged. Outside of the sections providing for the constitution of the Board of County Commissioners, all the rest of the act stands as unquestioned law.

The decisions of the Supreme Court of Tennessee do not touch this question. They decide (1) That the legislature had no constitutional power "to supplant and abolish that ancient institution of the State known as the Quarterly Court, and place in its stead a board of three commissioners;" and, (2) that § 25 is further open to the constitutional objection that it is special legislation for one or two counties; but they nowhere decide that the Board of Commissioners, though unconstitutional in respect of the functions of the County Court, may not have been a legal body for the purpose of exercising the *additional* powers conferred upon it. And the later expression of opinion by the court in *McLean* v. *Tennessee*, 8 Heiskell, 22, 237, intimates a recognition of this distinction. The power to subscribe for stock in a railroad and issue bonds is distinct from the power of taxation. *Police Jury* v. *Britton*, 15 Wall. 566; *Clairborne County* v. *Brooks*, 111 U. S. 400; *United States* v. *New Orleans*, 98 U. S. 381. And there is nothing in the Constitution of Tennessee restricting the power of the Legislature to designate any agent it may select to execute the former power. *Louisville & Nashville Railroad Co.* v. *County Court*, 1 Sneed, 677. See also *United States v. Baltimore & Ohio Railroad Co.*, 17 Wall. 322.

II. Even though § 25 of the act of March 9, 1867, should be condemned as unconstitutional in all its parts, yet the subscription to the stock made by the commissioners, and the bonds issued by them while in the undisturbed tenure of their office as justices of the County Court, are good and binding as regards third persons and the public, including the holders of the bonds, as the acts of a *de facto* court or of *de facto* officers.

It is clear on the face of the act, and is admitted by the pleadings that the legislature intended to confer upon the *county* power to subscribe for the stock and issue the bonds ; and that this power was assumed and exercised by the commissioners on behalf of the county, and that their acts were sustained

by the State authorities. It must be also noted that the identity of the *court* with all its powers, functions, and jurisdiction was preserved by the act of March 9, 1867. The change the act made was in providing commissioners as judges in the place of justices of the peace. Although the tenure of office of the commissioners may have been unconstitutional and illegal, they were *de facto* officers, and their acts as such were, as to the public and third persons, as binding as the acts of the justices of the peace assembled in the County Court would have been if the statute installing the Commissioner in their place had not been passed. *Cocke* v. *Halsey*, 16 Pet. 71; *County of Ralls* v. *Douglas*, 105 U. S. 728. The decision of the Supreme Court of Tennessee in the *Butterworth Case* (not yet reported) is utterly at variance with these decisions of this court, and with the great array of authorities. The only case cited by the court in support of it is *Hildreth* v. *M'Intire*, 1 J. J. Marsh. 206, which arose under circumstances so peculiar as to deprive it of any weight as an authority on the general question. And the other cases relied upon, *Carlton* v. *People*, 10 Mich. 250; *Ex parte Strang*, 21 Ohio St. 610, and *Hooper* v. *Goodwin*, 48 Maine, 79, fail to sustain the point relied upon. On the other hand, the great leading case of *State* v. *Carroll*, 38 Conn. 449; and the cases of *Brown* v. *O'Connell*, 36 Conn. 432; *Taylor* v. *Skrine*, 3 Brevard, 516; *People* v. *White*, 24 Wend. 520; *Clark* v. *Commonwealth*, 29 Penn. St. 129; and *Commonwealth* v. *McCombs*, 56 Penn. St. 436, all cited in the Connecticut case, support the proposition that the acts of an officer holding, under an *unconstitutional* law, are valid and binding as regards the public and third persons, until such law is adjudged to be unconstitutional. See also *State* v. *Bloom*, 17 Wis. 521; *Demarest* v. *Wickham*, 63 N. Y. 320; *Kimball* v. *Alcorn*, 45 Miss. 151; *Fleming* v. *Mulhall*, 9 Missouri App. 71; *Woodside* v. *Wagg*, 71 Maine, 207; *Sheehan's Case*, 122 Mass. 445; *Fowler* v. *Bebee*, 9 Mass. 231. The courts of Tennessee have acquiesced in this doctrine. *Ward* v. *The State*, 2 Coldwell, 605; *Blackburn* v. *The State*, 3 Head, 690.

III. By the acts of the County Court subsequent to their

reinstatement, which took place November, 15, 1869, the previous issue of the bonds was ratified by the county.

(*a*) Full legislative authority having been given to the *county* to issue the bonds, a defect in the channel by which they were issued can be cured by ratification. *Ralls County Court* v. *United States*, 105 U. S. 733; *County of Daviess* v. *Huidekooper*, 98 U. S. 98; *Supervisors* v. *Schenck*, 5 Wall. 772; *County of Scotland* v. *Thomas*, 94 U. S. 682. The cases of *Marsh* v. *Fulton Co.*, 10 Wall. 676; *Loan Association* v. *Topeka*, 20 Wall. 655; *Thompson* v. *Perrine*, 103 U. S. 806; *Harshman* v. *Bates County*, 92 U. S. 569; *Lewis* v. *Shreveport*, 108 U. S. 282; *Ottawa* v. *Carey*, 108 U. S. 110, were all cases where either there was no grant whatever of legislative authority, or where the authority was granted upon a condition which never took place.

(*b*) The provision in the constitution of 1870 was not equivalent to a prohibition to ratify or validate subscriptions already made, or bonds issued prior to the adoption of the amendment. It related to *future* loans and *future* subscriptions.

IV. The transactions between the County Court and the Paducah and Gulf Railroad Company, as represented by the plaintiff, in October, 1871, in reliance upon which transactions that company was consolidated with the Mississippi River Railroad Company, and the bonds of the latter company, now in suit, subsequently purchased by the plaintiff, estop the county from questioning the validity of the bonds in his hands.

V. The decisions of the Supreme Court of Tennessee, declaring the act of March 9, 1867, establishing a board of commissioners for Shelby County, unconstitutional and void are not binding upon this court, which is entitled to examine the question *de novo ;* and the act itself was constitutional. They are at variance with the prior cases of *Moore* v. *The State*, 5 Sneed, 510; *Wilcox* v. *The State*, 3 Heiskell, 110; and the subsequent case of *Halsey* v. *Gaines*, 2 B. J. Lea, 319.

*Mr. D. H. Poston* for plaintiff in error (*Mr. W. K. Poston* was with him on his brief) cited, in addition to the cases cited

by *Mr. Choate,* the following—Upon the question of authority: *County of Tipton* v. *Locomotive Works,* 103 U. S. 523; *Fargason* v. *Lauderdale Co.,* 7 Lea. 153; *Bell* v. *Bank of Nashville,* Peck (Tenn.), 269; *Hope* v. *Deaderick,* 8 Humphries, 1; *Blomer* v. *Stolley,* 5 McLean, 158; *Pine Grove* v. *Talcott* 19 Wall. 666; *Hartford Bridge Co.* v. *Union Ferry Co.,* 29 Conn. 210; *Ward* v. *State,* 2 Coldwell, 605; *Venable* v. *Curd,* 2 Head, 582; *Pearce* v. *Hawkins,* 2 Swan, 87; *Brown* v. *Lant,* 37 Maine, 423; *McKinstry* v. *Tanner,* 9 Johns. 135; *Bucknam* v. *Ruggles,* 15 Mass. 180; *Havermeyer* v. *Iowa County,* 3 Wall. 294; *Ohio Life & Trust Co.* v. *Debolt,* 16 How. 416; *Cass County* v. *Johnston,* 95 U. S. 360; *Douglass County* v. *Pike,* 101 U. S. 679; *Groves* v. *Slaughter,* 15 Pet. 449; *Rowan* v. *Runnells,* 5 How. 134; *Planter's Bank* v. *Sharp,* 6 How. 301; *State Bank* v. *Knoop,* 16 How. 369; *Butz* v. *Muscatine,* 8 Wall. 575; *Olcott* v. *Supervisors,* 16 Wall. 678; *Philadelphia* v. *Field,* 58 Penn St. 320; *Darlington* v. *Mayor,* 31 N. Y. 164; *People* v. *Flagg,* 46 N. Y. 401; *Guilford* v. *Supervisors,* 13 N. Y. (3 Kern.) 143; *Luehrmann* v. *Taxing District,* 2 Lea, 425. On the question of ratification: *McCracken* v. *San Francisco,* 16 Cal. 591; *Seago* v. *Martin,* 6 Heiskell, 308; *O'Conner* v. *Carver,* 12 Heiskell, 436; *Lloyd* v. *Brewster,* 4 Paige, 537; *Oil Works* v. *Jefferson,* 2 Lea, 581; *Walker* v. *Walker,* 7 Baxter, 260; *Nugent* v. *Supervisors,* 19 Wall. 241; *State* v. *Anderson Co.,* 8 Baxter, 249; *Pendleton County* v. *Amy,* 13 Wall. 297; *County of Ray* v. *Vansycle,* 96 U. S. 675; *Johnson* v. *Stark County,* 24 Ill. 75, 90; *Keithsburg* v. *Frick,* 34 Ill. 405, 421; *Hart* v. *Dixon,* 5 Lea, 336; *Hatten* v. *Stewart,* 2 Lea, 233; *Brownson* v. *Chappell,* 12 Wall. 681; *County of Callaway* v. *Foster,* 93 U. S. 567; *County of Scotland* v. *Thomas,* 94 U. S. 628; *County of Henry* v. *Nicolay,* 95 U. S. 619; *County of Macon* v. *Shores,* 97 U. S. 272; *County of Schuyler* v. *Thomas,* 98 U. S. 169; *Supervisors* v. *Galbraith,* 99 U. S. 214; *Fairfield* v. *Gallatin County,* 100 U. S. 47; *Callens* v. *East Tenn., Va. & Geo. Railroad,* 9 Heiskell, 841.

*Mr. W. B. Glisson, Mr. R. D. Jordan,* and *Mr. Julius A. Taylor* for defendant in error.

Mr. JUSTICE FIELD delivered the opinion of the court.

This is an action upon twenty-nine bonds, of $1000 each, alleged to be the bonds of Shelby County, Tennessee, issued on the 1st of March, 1869, and payable on the 1st of January, 1873, with interest from January 1, 1869, at six per cent. per annum, payable annually on the surrender of matured interest coupons attached; and three coupons of $60 each. The following is a copy of one of the bonds and of a coupon:

"$1000          UNITED STATES OF AMERICA,          $1000

Issued under and by virtue of section 6 of an act of the Legislature of the State of Tennessee, passed February 25th, 1867, amended on the 12th day of February, 1869, and by authority conferred upon the county commissioners of Shelby County by section 25 of an act passed March 9th, 1867.

*State of Tennessee.*

(Vignette.)

A special tax is levied by authority of law upon all the taxable property in the county of Shelby, to meet the principal and interest of these bonds, collectible in equal annual instalments running through six years, as the bonds themselves mature.

Shelby County Railroad Bond No. 176.

Be it known that the county of Shelby, State of Tennessee, is indebted to the Mississippi River Railroad Company or bearer in the sum of one thousand dollars, payable in the city of Memphis on the first day of January, eighteen hundred and seventy-three, with interest at the rate of six per cent. per annum from January 1, 1869, payable annually in said city upon surrender of the matured interest coupons hereto attached.

This is one of three hundred $1000 bonds, all of the same denomination and rate of interest, issued by Shelby County in payment of a subscription of three hundred thousand dollars to the Mississippi River Railroad Company, made by the county commissioners under the authority of the acts above recited, transferable by delivery and redeemable in six years, at the rate of fifty thousand dollars a year, commencing January 1, 1870.

Dated at the city of Memphis, county of Shelby, State of Tennessee, the first day of March, 1869.

[Seal County Court of Shelby County, Tenn.]

BARBOUR LEWIS,
*President of the Board of County Commissioners of Shelby County.*

JNO. LOAGUE,
*Clerk of County Court of Shelby County.*"

" $60       STATE OF TENNESSEE,       $60
*Shelby County.*

Coupon No. —— of Bond No. 264.

The trustee of Shelby County will pay to the bearer sixty dollars in the city of Memphis on the 1st day of January, 1875, being interest due on bond No. 264, for $1000, of bonds issued to Mississippi River Railroad Company.

[Seal County Court of Shelby County, Tenn.]

(Signed)       JOHN LOAGUE,
*Clerk of Shelby County Court.*"

The plaintiff contends—

1st. That the commissioners, by whose directions the bonds were issued, and whose president signed them, were lawful officers of Shelby County, and authorized under the acts mentioned in the heading of the bonds, to represent and bind the county by the subscription to the railroad company, and that the bonds issued were, therefore, its legal obligations.

2d. That if the commissioners were not officers *de jure* of the county, they were officers *de facto*, and, as such, their action in making the subscription and issuing the bonds is equally binding upon the county; and

3d. That the action of the commissioners, whatever their want of authority, has been ratified by the county.

The defendant contends—

1st. That the commissioners were not lawful officers of the county, and that there was no such office in Tennessee as that of county commissioner.

2d. That there could not be any such *de facto* officers, as

there was no such office known to the laws, and, therefore, that the subscription was made and the bonds were issued without authority and are void ; and

3d. That the action of the commissioners was never ratified, and was incapable of ratification by the county.

Upon the first question presented, that which relates to the lawful existence and authority of the county commissioners, we are relieved from the necessity of passing. That has been authoritatively determined by the Supreme Court of Tennessee, and is not open for consideration by us.

From an early period in the history of the State—indeed, from a period anterior to the adoption of her constitution of 1796 —to the passage of the act of March 9, 1867, the administration of the government in local matters in each county was lodged in a county court, or quarterly court as it was sometimes called, composed of justices of the peace, elected in its different districts. The constitution of 1796 recognizes that court as an existing tribunal, and the constitution of 1834 prescribes the duties of the justices of the peace composing it. This county court alone had the power to make a county subscription to the Mississippi River Railroad Company, to issue bonds for the amount, and to levy taxes for its payment, unless the act of March 9, 1867, invested the board of commissioners with that authority. Statutes of 1867, ch. 48, § 6. That act created the board, and provided that it should consist of five persons, residents of the county for not less than two years, each to serve for the period of five years and until his successor should be elected and qualified. The 25th section vested in it all the powers and duties then possessed by the quarterly court of the county, and in addition thereto the authority " to subscribe stock in railroads which the county court of Shelby County has been authorized by general and special law to subscribe, and under the same conditions and restrictions, and to represent such stock in all elections for directors, and provide for payment of subscriptions as made."

The validity of this act superseding the county court was at once assailed as in violation of the constitution of the State. Within a month after its passage William Walker and other

justices of the peace of the county, in their official character, and as citizens and taxpayers, filed a bill in chancery in the name of the State, at their relation, against the commissioners appointed, alleging that they had usurped and were unlawfully exercising the powers and functions of the justices, and had taken into custody the records of the county under the act, which the relators insisted was in violation of the constitution, mentioning several sections with which it conflicted; and praying that the act be adjudged void, that the attempt of the commissioners to exercise the powers of the justices be declared a usurpation, and that the commissioners be perpetually enjoined from exercising them. The case having been decided adversely to the relators, an appeal was taken to the Supreme Court of the State, and pending the appeal the subscription to the stock of the Mississippi River Railroad Company was made by the commissioners, and the bonds were issued. Before the appeal was heard the Supreme Court of the State had under consideration a similar statute passed on the 12th of March, 1868, for Madison County, and extended to White County, which, in like manner, undertook to supersede the quarterly courts of those counties and substitute in their place boards of commissioners with the same powers as those conferred upon the commissioners of Shelby County. The case in which such consideration was had was *Pope* v. *Phifer*, 3 Heiskell, 691. Under this act three commissioners were appointed by the governor, being the number prescribed to constitute the board of White County. The bill was filed to restrain them from organizing as a board, to have the act declared unconstitutional, and to perpetually enjoin them from acting under it. The court states in its opinion that the question as to the validity of the act was argued with great ability by counsel on both sides, and the opinion itself shows that the question was carefully considered. The chancellor, as in the case of the State at the relation of Walker and others against the Commissioners, dismissed the bill. The Supreme Court reversed the decree, and perpetually enjoined the defendants from acting as a board of commissioners. It held that the act creating the board and conferring on the commissioners appointed by

the governor the powers of justices of the peace of the county court was unconstitutional and void; that the county court was one of the institutions of the State, recognized in the constitution; that the powers conferred by it upon the justices of the peace in their collective capacity were intended to be exercised by that court; and that the power to tax for purposes of the county could not, by any special or local law, be taken from the justices of the peace as a county court and conferred upon local tribunals of particular counties composed of commissioners appointed by the governor.

This decision was made in February, 1871. In June following the case mentioned above of the State at the relation of Walker and others against the Commissioners of Shelby County was decided in conformity with it, the Supreme Court holding that at the time the bill was filed the justices were entitled to the relief prayed, and that the decree dismissing the bill was erroneous, and it so adjudged and decreed. But it said that as the act under which the bill alleged that the defendants had usurped office had since then been repealed, and that they had not afterwards assumed to exercise the powers and perform the duties named in the act, it was only necessary, in addition to what was decreed above, to dispose of the costs; and that disposition was made by taxing them against the defendants and awarding execution therefor.

In the same month the Supreme Court decided the case of Butterworth against Shelby County, which also involved a consideration of the validity of the act creating the board of commissioners of that county.* The action was upon county warrants issued by the board and signed by Barbour Lewis as its president, as the bonds in this suit are signed. The court held that the act creating the board was unconstitutional, that the board was an illegal body, and that, as a necessary consequence, the warrants of the county were invalid. Judgment was accordingly rendered for the defendant. Chief Justice Nicholson, in delivering the opinion of the court, referred to

---

* This case does not appear to be reported. A copy of the opinion was furnished the court by counsel.

the two decisions mentioned, and said that they had "determined that the legislature exceeded its constitutional powers in assuming to abolish the county court and substitute in its place a board of county commissioners with the powers before belonging to the county court. The act of March 9, 1867, was, therefore, a nullity and the board of commissioners appointed and organized thereunder was an unauthorized and illegal body. The act was inoperative as to the existing organization, powers, and duties of the county court. Neither the board of commissioners nor Barbour Lewis, its president, had any more powers under said act than if no act had been passed."

Counsel for the plaintiff have endeavored to show that the adjudication in these cases has been questioned by later decisions, and therefore should have no controlling force in this litigation. A careful examination of those decisions fails to support this position. The opinion that the act was invalid because it was special legislation applicable only to certain counties would seem indeed to be thus modified. But the adjudication that the constitution did not permit the appointment of commissioners to take the place of the justices of the peace for the county, and perform the duties of the county court, stands unimpaired, and as such is binding upon us. Two of the cases, as we have seen, were brought against the commissioners, in one case, of Shelby County, and in the other, of White County, to test the validity of the acts under which they were appointed, or about to be appointed, and their right to assume and exercise the functions and powers of the justices of the peace, and hold the county court in their place. From the nature of the questions presented we cannot review or ignore this determination. Upon the construction of the constitution and laws of a State, this court, as a general rule, follows the decisions of her highest court, unless they conflict with or impair the efficacy of some principle of the Federal Constitution, or of a Federal statute, or a rule of commercial or general law. In these cases no principle of the Federal Constitution, or of any Federal law, is invaded, and no rule of general or commercial law is disregarded. The determination made relates to the existence

of an inferior tribunal of the State, and that depending upon the constitutional power of the legislature of the State to create it and supersede a pre-existing institution. Upon a subject of this nature the Federal courts will recognize as authoritative the decision of the State court. As said by Mr. Justice Bradley, speaking for the court in *Claiborne County* v. *Brooks*, 111 U. S. 400, 410: "It is undoubtedly a question of local policy with each State, what shall be the extent and character of the powers which its various political and municipal organizations shall possess; and the settled decisions of its highest courts on this subject will be regarded as authoritative by the courts of the United States; for it is a question that relates to the internal constitution of the body politic of the State." It would lead to great confusion and disorder if a State tribunal, adjudged by the State Supreme Court to be an unauthorized and illegal body, should be held by the Federal courts, disregarding the decision of the State court, to be an authorized and legal body, and thus make the claims and rights of suitors depend, in many instances, not upon settled law, but upon the contingency of litigation respecting them being before a State or a Federal court. Conflicts of this kind should be avoided if possible by leaving the courts of one sovereignty within their legitimate sphere to be independent of those of another, each respecting the adjudications of the other on subjects properly within its jurisdiction.

On many subjects the decisions of the courts of a State are merely advisory, to be followed or disregarded, according as they contain true or erroneous expositions of the law, as those of a foreign tribunal are treated. But on many subjects they must necessarily be conclusive; such as relate to the existence of her subordinate tribunals; the eligibility and election or appointment of their officers; and the passage of her laws. No Federal court should refuse to accept such decisions as expressing on these subjects the law of the State. If, for instance, the Supreme Court of a State should hold that an act appearing on her statute book was never passed and never became a law, the Federal courts could not disregard the decision and declare that it was a law and enforce it as such. *South Ottawa* v. *Perkins*, 94 U. S. 260; *Post* v. *Supervisors*, 105 U. S. 667.

The decision of the Supreme Court of Tennessee as to the constitutional existence of the board of commissioners of Shelby County is one of this class. That court has repeatedly adjudged, after careful and full consideration, that no such board ever had a lawful existence; that it was an unauthorized and illegal body; that its members were usurpers of the functions and powers of the justices of the peace of the county; and that their action in holding the county court was utterly void. This court should neither gainsay nor deny the authoritative character of that determination. It follows that in the disposition of the case before us we must hold that there was no lawful authority in the board to make the subscription to the Mississippi River Railroad Company and to issue the bonds of which those in suit are a part.

But it is contended that if the act creating the board was void, and the commissioners were not officers *de jure*, they were nevertheless officers *de facto*, and that the acts of the board as a *de facto* court are binding upon the county. This contention is met by the fact that there can be no officer, either *de jure* or *de facto*, if there be no office to fill. As the act attempting to create the office of commissioner never became a law, the office never came into existence. Some persons pretended that they held the office, but the law never recognized their pretensions, nor did the Supreme Court of the State. Whenever such pretensions were considered in that court, they were declared to be without any legal foundation, and the commissioners were held to be usurpers.

The doctrine which gives validity to acts of officers *de facto*, whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy and necessity, for the protection of the public and individuals whose interests may be affected thereby. Offices are created for the benefit of the public, and private parties are not permitted to inquire into the title of persons clothed with the evidence of such offices and in apparent possession of their powers and functions. For the good order and peace of society their authority is to be respected and obeyed until in some regular mode prescribed by law their title is investigated and deter-

mined. It is manifest that endless confusion would result if in every proceeding before such officers their title could be called in question. But the idea of an officer implies the existence of an office which he holds. It would be a misapplication of terms to call one an officer who holds no office, and a public office can exist only by force of law. This seems to us so obvious that we should hardly feel called upon to consider any adverse opinion on the subject but for the earnest contention of plaintiff's counsel that such existence is not essential, and that it is sufficient if the office be provided for by any legislative enactment, however invalid. Their position is, that a legislative act, though unconstitutional, may in terms create an office, and nothing further than its apparent existence is necessary to give validity to the acts of its assumed incumbent. That position, although not stated in this broad form, amounts to nothing else. It is difficult to meet it by any argument beyond this statement. An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.

In *Hildreth* v. *M'Intire*, 1 J. J. Marsh. 206, we have a decision from the Court of Appeals of Kentucky which well illustrates this doctrine. The legislature of that State attempted to abolish the Court of Appeals established by her constitution, and create in its stead a new court. Members of the new court were appointed and undertook to exercise judicial functions. They dismissed an appeal because the record was not filed with the person acting as their clerk. A certificate of the dismissal signed by him was received by the lower court, and entered of record, and execution to carry into effect the original decree was ordered to issue. To reverse this order an appeal was taken to the constitutional Court of Appeals. The question was whether the court below erred in obeying the mandate of the members of the new court, and its solution depended upon another, whether they were judges of the Court of Appeals and the person acting as their clerk was its clerk. The court said : " Although they assumed the functions of judges and clerk, and attempted to act as such,

their acts in that character are totally null and void unless they had been regularly appointed under, and according to, the constitution. A *de facto* court of appeals cannot exist under a written constitution which ordains one supreme court, and defines the qualifications and duties of its judges, and prescribes the mode of appointing them. There cannot be more than one court of appeals in Kentucky as long as the constitution shall exist; and that must necessarily be a court '*de jure.*' When the government is entirely revolutionized, and all its departments usurped by force, or the voice of a majority, then prudence recommends and necessity enforces obedience to the authority of those who may act as the public functionaries, and in such a case the acts of a *de facto* executive, a *de facto* judiciary, and a *de facto* legislature must be recognized as valid. But this is required by political necessity. There is no government in action except the government *de facto,* because all the attributes of sovereignty have, by usurpation, been transferred from those who had been legally invested with them, to others who, sustained by a power above the forms of law, claim to act, and do act, in their stead. But when the constitution or form of government remains unaltered and supreme, there can be no *de facto* department, or *de facto* office. The acts of the incumbents of such departments or office cannot be enforced conformably to the constitution, and can be regarded as valid only when the government is overturned. When there is a constitutional executive and legislature, there cannot be any other than a constitutional judiciary. Without a total revolution there can be no such political solecism in Kentucky as a '*de facto*' court of appeals. There can be no such court whilst the constitution has life and power. There has been none such. There might be under our constitution, as there have been, '*de facto*' officers. But there never was and never can be, under the present constitution, a '*de facto*' office." And the court held that the gentlemen who acted as judges of the legislative tribunal were not incumbents of *de jure* or *de facto* offices, nor were they *de facto* officers of *de jure* offices, and the order below was reversed.

In some respects the case at bar resembles this one from Ken-

tucky. Under the constitution of Tennessee there was but one county court. That was composed of the justices of the county elected in their respective districts. The commissioners appointed under the act of March 9, 1867, by the governor were not such justices, and could not hold such court, any more than the legislative tribunal of Kentucky could hold the Court of Appeals of that State. In *Shelby County* v. *Butterworth*, from the opinion in which we have already quoted, Chief Justice Nicholson, speaking of the claim that Barbour Lewis, the President of the Board of County Commissioners, was a *de facto* officer, after referring to the decisions of the Supreme Court of the State holding that the board of commissioners was an illegal and unconstitutional body, said: " This left the organization of the county court in its former integrity, with its officers entitled to their offices and creating no vacancy to be filled by the illegal action under the act of 1867. It follows that Barbour Lewis could not be a *de facto* officer, as there was no legal board of which he could be president, and as there was no vacancy in the legal organization. The warrants issued by him show the character in which he was acting, and repel the presumption that he was a *de facto* officer. He could be under the circumstances, as we can judicially know from the law and pleadings in the case, nothing but a usurper. There must be a legal office in existence, which is being improperly held, to give to the acts of such incumbent the validity of an officer *de facto*."

Numerous cases are cited in which expressions are used which, read apart from the facts of the cases, seemingly give support to the position of counsel. But, when read in connection with the facts, they will be seen to apply only to the invalidity, irregularity, or unconstitutionality of the mode by which the party was appointed or elected to a legally existing office. None of them sanctions the doctrine that there can be a *de facto* office under a constitutional government, and that the acts of the incumbent are entitled to consideration as valid acts of a *de facto* officer. Where an office exists under the law, it matters not how the appointment of the incumbent is made, so far as the validity of his acts are concerned. It is

enough that he is clothed with the insignia of the office, and exercises its powers and functions. As said by Mr. Justice Manning, of the Supreme Court of Michigan, in *Carleton* v. *The People*, 10 Mich. 250, 259, " where there is no office there can be no officer *de facto*, for the reason that there can be none *de jure*. The county offices existed by virtue of the constitution the moment the new county was organized. No act of legislation was necessary for that purpose. And all that is required when there is an office to make an officer *de facto*, is that the individual claiming the office is in possession of it, performing its duties, and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary his election or appointment should be valid, for that would make him an officer *de jure*. The official acts of such persons are recognized as valid on grounds of public policy, and for the protection of those having official business to transact."

The case of *The State* v. *Carroll*, 38 Conn. 449, decided by the Supreme Court of Connecticut, upon which special reliance is placed by counsel, and which is mentioned with strong commendation as a landmark of the law, in no way militates against the doctrine we have declared, but is in harmony with it. That case was this: The constitution of Connecticut provided that all judges should be elected by its general assembly. An act of the legislature authorized the clerk of a city court, in case of the sickness or absence of its judge, to appoint a justice of the peace to hold the court during his temporary sickness or absence. A justice of the peace having thus been called in and having acted, a question arose whether the judgments rendered by him were valid. The court held that whether the law was constitutional or not, he was an officer *de facto*, and, as such, his acts were valid. The opinion of Chief Justice Butler is an elaborate and admirable statement of the law, with a review of the English and American cases, on the validity of the acts of *de facto* officers, however illegal the mode of their appointment. It criticises the language of some cases that the officer must act under color of authority conferred by a person having power, or *prima facie* power, to appoint or elect in the particular case ; and it thus defines an officer *de facto* :

"An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office are exercised :

" First. Without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

" Second. Under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent, requirement, or condition, as to take an oath, give a bond, or the like.

" Third. Under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

" Fourth. Under color of an election or an appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such."

Of the great number of cases cited by the Chief Justice none recognizes such a thing as a *de facto* office, or speaks of a person as a *de facto* officer, except when he is the incumbent of a *de jure* office. The fourth head refers not to the unconstitutionality of the act creating the office, but to the unconstitutionality of the act by which the officer is appointed to an office legally existing. That such was the meaning of the Chief Justice is apparent from the cases cited by him in support of the last position, to some of which reference will be made. One of them, *Taylor* v. *Skrine*, 3 Brevard, 516, arose in South Carolina in 1815. By an act of that State of 1799, the governor was authorized to appoint and commission some fit and proper person to sit as judge in case any of the judges on the circuit should happen to be sick, or become unable to hold the court in his circuit. A presiding judge of the court was thus appointed by the governor. Subsequently the act was declared to

be unconstitutional, and the question arose whether the acts of the judge were necessarily void. It was held that he was a judge *de facto* and acting under color of legal authority, and that as such his acts were valid. Here the judge was appointed to fill an existing office, the duties of which the legal incumbent was temporarily incapable of discharging. Another case is *Cocke* v. *Halsey*, in 16 Pet. 71. It there appeared that, by the constitution of Mississippi, the judges and clerks of probate were elected by the people. The legislature provided by law that, in case of the disability of the clerk, the court might appoint one. An elected clerk having left the State for an indefinite period, the judge appointed another to serve during his absence. The law authorizing the appointment was declared unconstitutional, but the acts of the clerk were deemed valid as those of an officer *de facto*. Here the office was an existing one created by law.

To *Carleton* v. *The People*, 10 Mich. 250, we have already referred. By the constitution of Michigan the laws of the legislature took effect ninety days after their passage. The legislature on the 4th of February passed an act creating a new county, and authorized the election of county officers in April following. The officers were elected within the ninety days, that is, before the act took effect, and they subsequently acted as such officers. The validity of their acts was questioned on the ground that there was at the time no law that authorized the election, but the officers were existing by the constitution, and as they subsequently entered upon the duties of those offices, it was held that they were officers *de facto*.

In *Clark* v. *Commonwealth*, from the Supreme Court of Pennsylvania, 29 Penn. St. 129, the question related only to the title of the officer. The constitution of that State provided for a division of the State into judicial districts, and for the election of the presiding judge of the county court for each district by the people thereof. The legislature passed a law transferring a county from one judicial district to another during the term for which the judge of the district had been elected, and whilst presiding judge of the district to which the county was thus transferred he held court, at which a prisoner was con-

victed of murder. It was contended that the act of the legis- lature was equivalent to an appointment of a judge for that county, and, therefore, unconstitutional. The Supreme Court held that, admitting the law to be unconstitutional, the judge was an officer *de facto*, and that the prisoner could not be heard to deny it. Here, also, the office was one created by law, and the only question was as to the constitutionality of the law authorizing the judge to exercise it.

It is evident, from a consideration of these cases, that the learned Chief Justice, in *State* v. *Carroll*, had reference, in his fourth subdivision, as we have said, to the unconstitutionality of acts appointing the officer, and not of acts creating the office. Other cases cited by counsel will show a similar view.

In *Brown* v. *O'Connell*, 36 Conn. 432, the constitution of the State provided that the judges of the courts should be appointed by the general assembly. An act of the legislature established a police court in the city of Hartford, and provided for the appointment of judges of the court by the common council. It was held that the judge could be appointed only by the general assembly, and to that extent the act was unconstitutional. There was no question as to the validity of the act, so far as it established a police court, and the appointee of the common council was held to be a judge *de facto*.

The case of *Blackburn* v. *The State*, 3 Head, 690, only goes to show that the illegality of an appointment to a judicial office does not affect the validity of the acts of the judge. The constitution of Tennessee requires a judge to be thirty years of age. A judge under that age having been appointed, it was held that he could be removed by a proper proceeding, but until that was done his acts were binding.

In *Fowler* v. *Beebe*, 9 Mass. 231, the legislature passed an act erecting the county of Hampden, and provided that the law should take effect from the 1st of August next ensuing. Before that date the governor, with the advice and consent of the then council, commissioned a person as sheriff of the county. There was no such office at the time his commission was issued, but when the law went into effect he acted under his commission. It was only the case of a premature appoint-

ment; and it was held that he was an officer *de facto*, and that the legality of his commission could not be collaterally questioned.

None of the cases cited militates against the doctrine that, for the existence of a *de facto* officer, there must be an office *de jure*, although there may be loose expressions in some of the opinions, not called for by the facts, seemingly against this view. Where no office legally exists, the pretended officer is merely a usurper, to whose acts no validity can be attached; and such, in our judgment, was the position of the commissioners of Shelby County who undertook to act as the county court, which could be constitutionally held only by justices of the peace. Their right to discharge the duties of justices of the peace was never recognized by the justices, but from the outset was resisted by legal proceedings, which terminated in an adjudication that they were usurpers, clothed with no authority or official function.

It remains to consider whether the action of the commissioners in subscribing for stock of the Mississippi River Railroad Company and issuing the bonds, of which those in suit are a part, being originally invalid, was afterwards ratified by the county. The County Court, consisting of the justices of the peace, elected in their respective districts, alone had power to make a subscription and issue bonds. The sixth section of the act of February 25, 1867, to which the bonds on their face refer, provides: "That the County Court of any county through which the line of the Mississippi River Railroad is proposed to run, a majority of the justices in commission at the time concurring, may make a corporate or county subscription to the capital stock of said railroad company, of an amount not exceeding two-thirds the estimated cost of grading the road-bed through the county and preparing the same for the iron rails; the said cost to be verified by the sworn statement of the president or chief engineer of said company. And after such subscription shall have been entered upon the books of the railroad company, either by the chairman of the county court, or by any other member of the court appointed therefor, the court shall proceed, without further reference or delay, to levy an

assessment on all the taxable property within the county suf-
cient to pay said subscription; and the same shall be payable
in three equal annual instalments, commencing with the fiscal
year in which said subscription shall be made. And it shall be
lawful for county courts making subscriptions as herein pro-
vided, to issue short bonds to the railroad company, in anticipa-
tion of the collection of the annual levies, if thereby construc-
tion of the work may be facilitated. Statutes of 1866–1867,
ch. 48, § 6, p. 131.

On the 5th of the following November the legislature passed
an act declaring: "That the subscription authorized in said
sixth section to be made to the capital stock of the Mississippi
River Railroad Company, by the counties along the line of said
railroad, may be made at any monthly term of the county courts
of said counties, or at any special term of said courts: *Pro-
vided,* that a majority of all the justices in commission in the
counties respectively shall be present when any such subscrip-
tion is made; and *provided further,* that a majority of those
present shall concur therein." Private Acts, 1867–1868, ch. 6,
§ 1, page 5.

Neither of these acts, as counsel observe, recognizes or in any
way refers to the county commissioners, though the last act
was passed eight months after the act creating the board of
commissioners for Shelby County. Both provide that the sub-
scription may be made by the county court, but upon the con-
dition that a majority of all the justices in commission shall
be present and a majority of those present shall concur therein.

The county court met on the 15th of November, 1869, for
the first time after the passage of the act of March 9, 1867, and
assumed its legitimate functions as the governing agency of the
county. On the 11th of April, 1870, it again met and estab-
lished the rate of taxation for the Mississippi River Railroad
bonds at twenty cents on each one hundred dollars' worth of
taxable property. At its meeting on the 16th of that month
it ordered that the tax for those bonds should be ten cents on
each one hundred dollars' worth of property. At the meeting
on the 11th there were twenty two justices of the peace present,
of whom eighteen voted for the tax levy, and on the 16th only

twelve justices were present. There were in the county at that time forty five justices in commission. There were no other meetings of the county court until after May 5, 1870, on which day the new constitution of Tennessee went into effect, which declares that, " The credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an·election to be first held by the qualified voters of such county, city, or town, and the assent of three-fourths of the votes cast at said election. Nor shall any county, city, or town become a stockholder with others in any company, association or corporation, except upon a like election and the assent of a like majority."

By this provision of the constitution the county court, as thus seen, was shorn of any power to order a subscription to stock of any railroad company without the previous assent of three-fourths of the voters of the county cast at an election held by its qualified voters, and, of course, it could not afterwards, without such assent, give validity to a subscription previously made by the commissioners. It could not ratify the acts of an unauthorized body. To ratify is to give validity to the act of another, and implies that the person or body ratifying has at the time power to do the act ratified. As we said in *Marsh* v. *Fulton County*, 10 Wall. 676, 684, where it was contended, as in this case, that certain bonds of that county, issued without authority, were ratified by various acts of its supervisors : " A ratification is, in its effect upon the act of an agent, equivalent to the possession by him of a previous authority. It operates · upon the act ratified in the same manner as though the authority of the agent to do the act existed originally. It follows that a ratification can only be made when the party ratifying possesses the power to perform the act ratified. The supervisors possessed no authority to make the subscription or issue the bonds in the first instance without the previous sanction of the qualified voters of the county. The supervisors in that particular were the mere agents of the county. They could not, therefore, ratify a subscription without a vote of the county, because they could not make a subscription in the first instance without such authorization. It would be absurd to say that

they could without such vote, by simple expressions of approval, or in some other indirect way, give validity to acts, when they were directly in terms prohibited by statute from doing those acts until after such vote was had. That would be equivalent to saying that an agent, not having the power to do a particular act for his principal, could give validity to such act by its indirect recognition." 10 Wall. 676, 684. See also *County of Daviess* v. *Dickinson*, 117 U. S. 657; *McCracken* v. *City of San Francisco*, 16 Cal. 591, 623.

No election was held by the voters of Shelby County with reference to the subscription for stock of the Mississippi River Railroad Company after the new constitution went into effect. No subsequent proceedings, resolutions, or expressions of approval of the county court with reference to the subscription made by the county commissioners, or to the bonds issued by them, could supersede the necessity of such an election. Without this sanction the county court could, in no manner, ratify the unauthorized act, nor could it accomplish that result by acts which would estop it from asserting that no such election was had. The requirement of the law could not, in this indirect way, be evaded.

The case of *Aspinwall* v. *Commissioners of Daviess County*, 22 How. 364, is directly in point on this subject. There the charter of the Ohio and Mississippi Railroad Company, created by the legislature of Indiana in 1848, as amended in 1849, authorized the commissioners of a county, through which the road passed, to subscribe for stock and issue bonds, provided a majority of the qualified voters of the county voted on the first of March, 1849, that this should be done. The election was held on that day, and a majority of the voters voted that a subscription should be made. In September, 1852, the board of commissioners, pursuant to the acts and election, subscribed for 600 shares of the stock of the railroad company, amounting to $30,000, and in payment of it issued thirty bonds of $1000 each, signed and sealed by the president of the board and attested by the auditor of the county, and delivered the same to the company. These bonds drew interest at the rate of six per cent. per annum, for which coupons were attached.

The plaintiffs became the holders of sixty of these coupons, and upon them the suit was brought against the commissioners of the county. After the subscription was voted, but before it was made or the bonds issued, the new constitution of Indiana went into effect, which contained the following provision: "No county shall subscribe for stock in any incorporated company unless the same be paid for at the time of such subscription, nor shall any county loan its credit to any incorporated company, nor borrow money for the purpose of taking stock in any such company." Art. 10, section 6. This provision was set up against the validity of the bonds and coupons; and the question arose whether, under the charter of the company and its amendment, the right to the county subscription became so vested in the company as to exclude the operation of the new constitution. The court held that the provisions of the charter authorizing the commissioners to subscribe conferred a power upon a public corporation, which could be modified, changed, enlarged, or restrained by the legislature; that by voting for the subscription no contract was created which prevented the application of the new constitution; that the mere vote to subscribe did not of itself form a contract with the company within the protection of the Federal Constitution; that until the subscription was actually made no contract was executed; and that the bonds, being issued in violation of the new constitution of the State, were void. That constitution withdrew from the county commissioners all authority to make a subscription for the stock of an incorporated company, except in the manner and under the circumstances prescribed by that instrument, even though a vote for such subscription had been previously had, and a majority of the voters had voted for it. The doctrine of this case was reaffirmed in *Wadsworth* v. *Supervisors*, 102 U. S. 534.

It follows that no ratification of the subscription to the Mississippi River Railroad Company, or of the bonds issued for its payment, could be made by the county court subsequently to the new constitution of Tennessee, without the previous assent of three-fourths of the voters of the county, which has never been given.

The question recurs whether any ratification can be inferred from the action of the County Court on the 11th and 16th of April, 1870, which was had before that Constitution took effect.   At the meeting of the court on those days a rate of tax was established to be levied for the payment of the bonds, but it appears from its records that on both days less than a majority of the justices of the county were present; and the County Court under those circumstances could not even directly have authorized the subscription.   The levy of a tax for the payment of the bonds, when a less number of justices were present than would have been necessary to order a subscription, could not operate as a ratification of a void subscription.

It is unnecessary to pursue this subject further.   We are satisfied that none of the positions taken by the plaintiff can be sustained.   The original invalidity of the acts of the commissioners has never been subsequently cured.   It may be, as alleged, that the stock of the railroad company, for which they subscribed, is still held by the county.   If so, the county may, by proper proceedings, be required to surrender it to the company, or to pay its value; for, independently of all restrictions upon municipal corporations, there is a rule of justice that must control them as it controls individuals.   If they obtain the property of others without right, they must return it to the true owners, or pay for its value.   But questions of that nature do not arise in this case.   Here it is simply a question as to the validity of the bonds in suit, and as that cannot be sustained, the judgment below must be

*Affirmed.*