*STATE EX REL. GOTTLIEB BAMBACH v. JOHN W. MARKLE

1. NECESSITY OF AVERMENT OF CONTESTEE'S RESIDENCE.

In a contest of an election for common pleas judge in a subdivision composed of two counties, failure to aver that the contestee is a resident of the county in which the action is brought does not deprive the court of jurisdiction.

[For other cases in point, see 3 Cyc. Dig., "Elections," §§ 266-271.—Ed.]

2. ADMISSIBILITY OF PAROL EVIDENCE OF DESTROYED BALLOTS.

Where ballots have been destroyed by the judges of election, which the statute does not require shall be destroyed, oral testimony is admissible in a contest of the election to show how these ballots came to be destroyed, and for whom they were voted, and how they were marked.

3. PAROL EVIDENCE TO IDENTIFY POLL BOOKS AND TALLY SHEETS.

The will and judgment of voters cannot be rendered ineffectual through a disregard by the judges of election of their duty as laid down in the statute, whether such disregard be due to fraud, accident, mistake, misapprehension or negligence; and where such omitted duties with reference to the ballots cast were of a ministerial character, oral evidence is admissible to show the true character of the ballots as to which there is doubt, and to identify with certainty the poll books and tally sheets, and when the ballots in question are found to be truthful, they should be counted for the candidate for whom the voters intended they should be counted if that intention can be ascertained.

[For other cases in point, see 3 Cyc. Dig., "Elections," §§ 284-292.—Ed.]

4. SUFFICIENCY OF MARKING VOTE FOR NONPARTISAN CANDIDATE.

Inasmuch as a single candidate on a nonpartisan ticket has no party emblem and no one else can go on that ticket, the printing on the nonpartisan ticket of words indicating various offices to be filled and voted for, with a circle above and blocks outside of the column will be regarded as surplusage; and if a voter makes a mark above or below or on the side or at the top of the column occupied by the name of the nonpartisan candidate, his intention to vote for such candidate is clearly indicated and the ballot should be counted.

[For other cases in point, see 3 Cyc. Dig., "Elections," §§ 175-181.—Ed.]

5. RIGHT OF RESIDENTS OF ILLEGAL DISTRICT TO VOTE.

Where territory is transferred from one township to another by an unconstitutional statute, electors in such territory are not thereby made legal voters of the township to which it is sought to attach the territory.

6. WHEN VOTER MAY BE COMPELLED TO TELL HOW HE VOTED.

While the law does not permit the questioning of a legal voter as to how he voted, and an illegal voter might decline to answer on the ground that his answer might tend to incriminate him, yet where an illegal voter does not claim his privilege of refusing to testify, but voluntarily discloses that he did vote, he may be compelled to tell for whom he voted.

*Affirmed, without report, *Markley* v. *State*, 52 Bull. 359; 76 Ohio St. 636.

Brown County.

## WALTERS, J.

This case, as specially provided by statute, is in the nature of an appeal from the report and finding of the board of deputy state supervisors of Brown and Clermont counties, which counties constitute a common pleas subdivision.

The petition challenges the report made by the boards, of the result of the election for judge of common pleas court at the November election, 1906. In brief it states that the relator is an elector of this subdivision; that he was a candidate for judge of common pleas court upon a nonpartisan ticket at said election; that the deputy state board of supervisors in making up their report did not give him the required number of votes, and he alleges that if the vote had been counted as cast, he would have received a majority over the defendant. It is also alleged that John M. Markley was the candidate on the democratic, and R. M. McKinley was the candidate on the republican ticket. The relator further states that he applied to the clerk of the board of deputy state supervisors of Brown county, before the election, to obtain from him the form of the ballot that was to be used at the election. He received in answer from the clerk a typewritten copy of the form that was to be used; and he states that he used that form during the campaign in circulating sample ballots over the district, and representing that that would be the form of the official ballot which would thereafter appear and be voted. He says that it did not appear as handed to him by the clerk, and thereafter at the election, and by reason of that fact, there arose great confusion in the minds of the voters as to where to place their mark. He further says that in Byrd township, there should have been counted for him 142 votes. That in Hamersville he should have received 29 votes in the count, and in Mt. Oreb 77 votes, which the board of deputy state supervisors threw out. He further alleges that in the township of Perry John M. Markley received 205 votes which were counted for him, when in fact he only received 201 as the report of the judges show. There were 65 disputed ballots returned not counted, most of which will show he was entitled to the votes. That a large number of ballots were destroyed by the election judges, which were in dispute, and should have been sent up, but were not, and were votes for the contestor. That minors and nonresidents voted for the contestee and other illegal voters.

The answer protests, first, that this court has no jurisdiction whatever, because the petition does not allege that the contestee is a resident of Brown county, Ohio. He further avers that as to Byrd, Hamersville and Mt. Oreb, he also is entitled to certain votes if they are to be counted

State v. Markley.

at all. He objects to the poll books and tally sheets, alleging that some of them were not properly sealed, or transmitted in the form required by the statute; and that the ballots sent up by the judges did not contain a proper statutory certificate, certifying for whom, or whether they were counted at all by the judges of election, and that some of the ballots had no certificate whatever.

Some of the contentions on behalf of the contestee have been disposed of by this court during the progress of the trial. The objection to the jurisdiction of this court was so disposed of, the court holding that jurisdiction had been obtained. Also the court ruled during the progress of the trial that oral testimony was admissible to identify the ballots which were destroyed by the judges of election, and for whom said ballots were cast. These ballots were not counted. The majority of the court are still satisfied to adhere to the opinion thus rendered during the trial; and hold that the legislature having directed that all the ballots which have been counted and read, as provided by Rev. Stat. 2966-39 (Lan. 4538), and as to which ballots all requirements in that section had been complied with should be destroyed. That in the direction to destroy, and the destroying of such ballots, so counted and read, it was evident that the legislature meant by this destruction of the evidence, the best evidence, that the decision of the election judges should be final. But as to all ballots that were not required to be destroyed, they, after having been destroyed, might be the subject of review in a contest, and that oral evidence was competent to show how they came to be destroyed, and as to whom they were voted for, and how they were marked. The presiding judge has some doubt about a portion of this ruling—he holding that oral evidence was admissible concerning the ballots which the election judges had some dispute about, but did not certify up; and that the inquiry should be limited to that class of ballots.

It is further contended on behalf of the contestee that this court could not take into consideration any of these certified ballots where they have not been certified correctly, or not at all, by the judges, or how they were voted or counted, or whether counted at all, and that the want of such certificate required by the statute cannot be supplied by oral testimony.

He further objects that the poll books and tally sheets have not been properly sealed, and other formalities as required by the statute not complied with, that those omissions by the judges of election cannot now be inquired into, nor the want thereof supplied by oral evidence.

The view this court takes of these propositions, is this: The legislature has attempted to surround the election with every safeguard, in

order to insure the voter, when he casts his ballot in the ballot box, that it shall be thereafter honestly and correctly dealt with, and counted, in order that his individual conscience and will and judgment should be made effectual. The legislature to that end has provided the forms of ballots, directed how the ballots shall be marked, how the judges shall receive them, in what manner they shall be taken, counted and read, from the ballot box, how the results thus announced by them shall be recorded by the clerks, the manner and the form of the poll books and tally sheets, in what manner they shall be transmitted to the board of deputy state supervisors, how they shall be indorsed and sealed, and disputed ballots certified, and how, and by whom, and what the certificate shall contain. These safe guards are proper. But, let me inquire, was it the purpose of the legislature to take away from the voter the privilege of having his vote cast, and his will, and his conscience, and his judgment, or for that matter collectively the judgment of the entire voting precinct, made ineffectual because perchance the judges of election have disregarded their duty laid down by the statute, either through fraud, accident and mistake, or misapprehension or negligence, because perchance they have failed to seal up the poll books in the jackets provided, or properly to direct them, or properly to certify as to the disputed ballots, or properly to address or direct the envelope?

It would hardly strike the common sense or righteous judgment of any voter that that ought to be done. The voter has a right, having done his part to express his opinion, to have his vote counted and returned correctly. It is not the fault of the voter that the poll books, for instance, were not properly sealed; it is not the fault of the voter that the judges did not properly certify the disputed ballots; and it would seem evident that the negligent acts, omissions and mistakes or misapprehensions of the judges of election in failing to conform to the requisites should not work a disfranchisement of the individual voter, or all the voters of a precinct. To hold otherwise would seem to shock the sense of right and justice of most men. These acts of the judges which are simply ministerial in character may be inquired into. And oral evidence is admissible to show the true character of the ballots, and to identify with certainty the poll books and tally sheets; and when so clearly identified and shown to be truthful, they should be received as a verity by the court, and the ballots counted as the voter intended they should be, if that intention can be ascertained.

The same may be said of the destroyed ballots, if the electors who cast those ballots were entitled to have them counted and read and tallied, we do not see why they should be deprived of their votes because

State v. Markley.

the judges of election, through misapprehension of the law, or the manner in which they were marked, destroyed them without counting them for any one; at least evidence should be admitted, and if of a convincing character, should indicate that the votes should have been counted, the duty of the court would be to do so.

It is claimed that the vote from Mt. Oreb was thrown out because it had no jacket; the vote from Byrd township was thrown out because the clerks instead of putting down tallies in the boxes used for that purpose opposite the name of the common pleas judge, used numerals. No dispute has arisen from any single source during this trial which impugns the correctness of these poll books and tally sheets; there is no testimony to show that the numerals were incorrect; no complaint is made except as to the want of the formalities required by the statute. In Perry township there seems to have been four tallies following the first tally which now distinctly appears in the column opposite John Markley's name, which four tallies were at some time erased or rubbed out; the poll books now show that there were other marks there at one time. The judges and clerks certified that Judge Markley received 201 votes, which result was carried out in figures, and also written out in long-hand. The board of deputy state supervisors counted these partial or wholly obscured or erased ballot marks for Judge Markley. The contestee has offered no evidence in any way tending to show that those four erased or rubbed tally marks represented votes. The duplicate required to be transmitted to the clerk of the township shows 201 votes. Without any evidence that the count was incorrect we could not disturb the return and decision of the judges of election.

Before going further with this opinion it might be well to state, in a general way, the rule which we think should govern this court in the counting of these ballots, supplementing what has already been stated. A large number of these ballots are marked in an irregular way, especially the marks for Mr. Bambach in the nonpartisan column: some being above his name; some being in the place where the name of the secretary of state would appear; some in the circle in the Bambach column: and some immediately above Mr. Bambach's name; some in the block to the left of the Bambach column, but not in the block immediately to the left of Mr. Bambach's name; some in the block that appears on the right of the Bambach column; and in most every case where a mark is made in the Bambach circle the voter has voted one of the regular party tickets, by also making a mark in the circle. The contention of the contestee is, that no vote of any voter who voted the straight democratic or republican ticket by placing his mark under the eagle or under the rooster, and

Brown  County.

then passing over to the circle and making a mark in the nonpartisan
ticket in the circle, should be counted for Mr. Bambach; nor should any
other vote be counted for him unless the mark is made where the legis-
lature directed—in the block at the left hand of the candidate's name.

It is a rule of construction laid down by all text-writers upon the
subject of counting votes that the primary step is to determine, if pos-
sible, the intention of the voter, and where that can be done, no vote
should be thrown out.  This would seem to be a just rule as we all know
that a great many people in this country give but little attention to the
manner of voting under the Australian law, and especially where it is
desired to vote a mixed ticket, and that a great deal of confusion has
arisen.  It takes a pretty intelligent man, from one election to another,
his attention not having been called to the matter, and having given no
thought to the manner of voting, to step into the voting booth, and with-
out hesitation to vote a mixed ticket, and be sure it is correctly done.
The courts, therefore, have construed all those Australian ballot laws
in a liberal manner.  The legislature in adopting that system, and carry-
ing out that idea of construction in Lan. Rev. Stat. 4534 (B. 2966-35),
provided as follows:

"No ballot shall be rejected for any technical error which does not
make it impossible to determine the voter's choice."

In obedience to this rule of construction, if from an inspection, and
from the evidence, it is possible to determine the intention of the voter
you must do so.  In other words, if it is possible, in the language of the
statute, for us to determine for whom he intended to vote, it is our
solemn duty to preserve that vote.

It would seem that this nonpartisan ticket might just as well, and
rightfully, have been printed without any other designation upon it than
simply printing in the column opposite the other designation for the
same office, judge of common pleas court, straight across, in simply
printing his name there; there need be no circle at the top; no spaced
blank places, or printed words containing the words, "for secretary of
state" or for anybody else for either the state or county ticket.  If a
candidate is put upon a nonpartisan ticket he is put there by petition;
he has no party emblem as the other parties have, and there would seem
to be no use for a circle upon that ticket.  No other person can go on that
ticket excepting they get on by petition as Mr. Bambach did; no other
person has a right to have his name printed on that ballot excepting
the man who got it up for himself.  In the circle above the nonpartisan
ticket, around the edge of the same, is printed for a straight ticket,
"make mark within the circle."  The voters knew there was but one

State v. Markley.

man upon that ticket, Mr. Bambach, and it would seem to be an error of construction in terms to say, when only one man is upon a ticket, for a straight ticket "make mark within the circle." The words, "for secretary of state" and other words printed on the nonpartisan ticket indicating the various offices to be filled and voted for, as well as the circle above the column, were simply surplusage, and that Mr. Bambach, so far as that nonpartisan ticket is concerned, has the whole of that space above his name, below his name, the blocks at the right and left outside the column, as well as the circle, and if a voter votes, makes his mark in any of those places, his intention can be ascertained and would seem to be clear.

Why should a voter mark under the eagle for a straight republican ticket, and then pass over and make a mark in the nonpartisan ticket, and make it in the circle where it is not required to be by law? Why should he do that if he does not intend to vote for Mr. Bambach? If he puts the mark at the top of the column above Mr. Bambach's name, or below his name, or in any of the blank blocks at the right or left of that column, he knows that there is no other person than Mr. Bambach running on that nonpartisan ticket; that no other candidate's name appears there. On all the rest of the party tickets on the ballot there is a space left to rub out or write in somebody else's name; therefore, that blank in the Bambach column is not necessary for that purpose. When a voter makes a mark in any of the circles in the regular party ticket, and then makes a mark in the Bambach column anywhere, knowing that Mr. Bambach is the only candidate, and the only name on the whole nonpartisan ticket, isn't it clear that the voter intended to vote for him? We think so.

Following this rule, it becomes a very easy task to count these disputed votes that were sent up and sealed. Before, however, passing from this subject, while I have these ballots at hand, I will refer to another phase of this case: It seems from the Ripley precinct there are five votes which are either marked in the democratic or republican circle, and then at the left of Judge Markley's name is a cross; and also, out some place in all of them but one, on the Bambach ticket, is a mark.

It is claimed by the contestor that the mark at the left of Judge Markley's name was not there at the time these ballots were sealed, or, at least, at the time they were taken out of the box; that when they were taken out of the box no mark appeared at the left of Judge Markley's name. This contention is supported by two witnesses, Mr. Hite and Mr. Norris. These gentlemen appear to us to be, and it was conceded in argument that they were, reputable gentlemen, living in the vicinity or

## Brown County.

village of Ripley. They were intelligent men, whose testimony seemed to have been given with a sincerity born of truth. Each swears positively, each testifies pointedly and specifically and emphatically that at the time these ballots were turned out of the ballot box they examined each one of them, and that no such mark appeared or was there.

The testimony of the contestee relating to this point, consisting of the members of the board of deputy state supervisors, the auditor and the treasurer, each and all testified that after the votes were delivered to them they were never since disturbed, and were kept securely in the auditor's or treasurer's office in the safe, from that time until the time they were opened in this court.

During the progress of the trial this court indicated that counsel for the contestee should go no further on that subject, that they were satisfied that neither the board, the members thereof, the treasurer or auditor, nor anybody else, from the time these ballots were delivered to the board, tampered with them. And we think so now.

What is this court, however, to do with the testimony of these two witnesses. Mr. Hite, from recollection, testified as to in what manner the nineteen votes from this precinct were certified up, were marked, and he missed it in the three instances only. We have, as opposed to the testimony of these gentlemen, the written record, if you please, of the mark opposite Judge Markley's name and to the left thereof. Is that written record upon the face of it overthrown by the testimony of these witnesses? One of the judges, Mr. Lemons, in that Ripley precinct, is reported sick, and could not be here. The other judges and clerks were not called. Is the failure of Hite and Norris to recollect to be attributed to the failure and fallibility of the human mind and memory; have they forgotten? They, themselves, do not put it that way.

Upon this point the case made is not different from any other cases which we have often heard and decided. If, for instance, a petition which contained an allegation therein that the clause in a mortgage was not there at the time the mortgagor executed the same, and the witnesses and notary public should appear before this court and testify that that clause in that mortgage was not there at the time it was signed, that they read it over, and that their object in being there was to see whether or not that clause was there, and would testify positively that it was not there, would that be enough to override the solemnly executed and acknowledged mortgage instrument in writing? The court would have no hesitancy in declaring that the alleged stipulation in the mortgage was not there at the time it was signed. Two judges of that election were not called upon to testify. We are constrained to believe that that

mark to the left of Judge Markley's name was not there—that the testi-
mony clearly shows that it was not. We are well satisfied that the mem-
bers of the board of deputy state supervisors kept these ballots securely
and safely; that when they came into their possession they were not
thereafter tampered with.

There is another singular thing about Ballot A (1) in this connec-
tion, and that is, that in the republican circle there is a mark—there are
traces of a mark having been made in the circle under the rooster. There
is no mark in the nonpartisan column whatever. This is a mark to the
left of Judge Markley's name. The judges certified in their certificate
sent up that they counted all this ballot excepting for judge. The mark
being made in the republican circle, and one at the left of Judge Mark-
ley's name, if those were the only marks, there was no necessity of send-
ing this ballot up, as it would be a straight republican ticket except for
Judge Markley. They could not have been in doubt as to the erased
mark in the democratic circle, because they certified they counted the
ticket for all excepting judge. If there was a mark in both circles, one
each in the democratic and republican circles, it would count for no-
body. In any event, we cannot see how, consistently, with the fact that
the ticket was counted for all the candidates excepting judge, that there
could be any necessity for certifying this ballot at all. I only refer to
this as showing that this ballot appears to have gotten into this package
as a stray one—no possible necessity for its being certified at all—as
showing that there might possibly have been some little carelessness at
that polling precinct on that day.

There is a further contention here in regard to what may be called
the infirmary vote. It seems that in 1900, the township of Lewis, ad-
joining the village of Georgetown, included a small stream of water,
and that in that year a special act was passed by the Ohio legislature
detaching that portion of Lewis township on which the infirmary build-
ings are located from Lewis township and transferring that territory
to Pleasant township, in which township the village of Georgetown is
located. It is claimed that that law is unconstitutional. I need not here
enter into any discussion as to whether that act is so or not, for it is ad-
mitted. Being, therefore, unconstitutional and the record showing that
since 1900 the voters in the infirmary have been voting in Georgetown,
would the voter have still a legal right to vote there notwithstanding the
act was local in character and unconstitutional, until the act was so de-
clared by a court of competent jurisdiction? The Supreme Court in
Findlay v. Pendleton, 62 Ohio St. 80, 88 [56 N. E. Rep. 649], in speaking
of an unconstitutional law, uses this language:

### Brown County.

"It was void not only from the time it was declared unconstitutional, but it never had any validity, and could not be invoked as a foundation of a right to be enforced in a court of justice."

The Supreme Court of the United States in the case of *Norton* v. *Shelby Co.* 118 U. S. 425 [6 Sup. Ct. Rep. 1121; 30 L. Ed. 178], in the syllabus says:

"An unconstitutional act is not a law; it confers no rights, it imposes no duties, it affords no protection, it creates no offices. It is in legal contemplation as inoperative as though it had never been passed."

The unconstitutional act of 1900 did not operate to make the residents of Lewis township legal voters in Pleasant township or the village of Georgetown. The inmates and others, who voted at Georgetown, were asked by counsel for the contestor while on the stand whom they voted for in the fall of 1906 for judge of the common pleas court. This testimony, it was claimed on behalf of the contestee, ought not to have been received. It is true that a legal voter cannot be asked for whom he casts his vote. The object of the ballot system now in force is, that the voter shall have the right to keep secret all his life as to whom he did vote for. The same rule does not apply to the illegal voter; the man who has no right to vote his vote in a township or precinct other than that of his legal residence. *People* v. *Pease*, 27 N. Y. 45 [84 Am. Dec. 242], which last case has a voluminous note by Mr. Freeman collating the authorities. See also McCrary, Elections Sec. 196.

It is further contended that the witnesses could not be required to answer as to whom they voted for, because the answer might tend to criminate them. This is a personal privilege on the part of the witnesses. None of the witnesses in this case claimed that privilege until after they had voluntarily testified that they had voted. And, if a witness discloses that he did vote, and it is shown clearly to be an illegal vote, then he may be compelled to answer as to whom he voted for. There may be some doubt as to whether or not the answer to this question disclosing for whom these different witnesses voted would have any tendency to criminate them. In most all crimes the intent is the gist of the crime; and it certainly would be admitted by every one that these electors did not intend to cast any illegal vote, but honestly thought they were casting their votes in the proper precinct. We are satisfied that these votes, under the evidence and the law, should not be counted for Judge Markley. See same authorities cited above.

There was one witness, Mr. Henize, who was not an inmate of the infirmary, but was an employe, a single man, and had lived at the in-

State v. Markley.

firmary since 1904; he voted not in the village of Georgetown, but in the township of Pleasant, in which township is situated the voting precinct of the village of Georgetown. He testified that his parents had lived for many years in Pleasant township, and were living there at the time of the election, and that when he left his home to take up the work at the infirmary, or other places, his intention was, when out of a job, to return to his parents' home. Under these circumstances we think he had a right to vote where he did. If we had doubts, we should be bound to resolve the doubt in favor of the voter.

Samuel Smith, an inmate of the infirmary, says he voted the republican ticket; that should be taken off of Mr. Bambach's vote. This would seem to dispose of most of the disputed ballots in this case; and it seems to be a very easy matter, having once laid down the principle, to count these votes.

There is another subject, about which there is some difficulty, however, and that is in regard to the destroyed ballots. In Higginsport precinct there were four witnesses; Mr. Lyons testified that there were four destroyed ballots not counted for judge, two under the eagle in the circle, and in the Bambach circle, and one was marked under the eagle, and just above Bambach's name in the nonpartisan column. Mr. Cahill testifies the same as Mr. Lyons as to the two first, and says one was in the democratic circle, and just above Mr. Bambach's name in the center of the column; four voted in the republican circle, one above Markley's name. Mr. Hanselman also testified in regard to it, and Mr. Schaaf agreed substantially that three votes were marked for Bambach. In Eagle township there are five in question, and destroyed. O. P. Hare testified that two democrats voted in the circle, one in the democratic circle, about where the secretary of state's name should be, and one in the democratic circle under Bambach's name, three spaces below, and one was in the democratic circle and in the socialist column. Mr. Winters testified to the same thing; Mr. Hunley does not remember so much about it. Mr. Moore remembers what he heard the judges say during the time they were counting the ballots, and therefore we have disregarded his testimony entirely as hearsay. Mr. Alexander says three were not counted; one was a clean ballot, one marked in the republican circle, and a mark made where the secretary of state's name should be in the nonpartisan column, and one in the nonpartisan column in the place for sheriff. We have counted four ballots for Mr. Bambach under that testimony.

In Franklin township, Dr. W. L. Faul testified that six ballots were

Brown County.

destroyed, not counted for anybody; one had a cross mark in the circle, and one a cross under the eagle and the rooster; those of course could not be counted. On three of the ballots the name of Judge Markley was scratched; two of those were in the Bambach box and one in the Bambach circle. W. L. Kautz, judge, does not remember much about it; the clerk says that there was one under the rooster and in the nonpartisan circle, and one under the rooster, and Markley's name scratched, and at the right of Bambach's name was a cross mark. We have given three votes to Mr. Bambach under that evidence.

In Bardwell precinct, F. M. Kratzer, presiding judge, testified that one was marked in the republican circle and a cross in Bambach ticket in the circle, the other a democratic ticket with cross in the circle and a cross in the Bambach circle. We have given Bambach these two votes.

In Jefferson township, George B. Carey testified that four ballots were destroyed, one only not counted, the other three counted; one properly should have been counted for Bambach, the other three would be counted ballots. Under the ruling of this court no evidence could be admitted in regard to them; we have therefore thrown them out.

In Washington township, E. P. Calvin testified that there were two ballots certified up, one only reached the board of deputy state supervisors, the other it is shown was clearly identified as marked for judge, Mr. Bambach. .

As to one vote in Higginsport, two in Eagle, and one in Washington, there appears to have been a clear dispute as to whether or not these ballots should be certified up; therefore, in the opinion of the presiding judge, these votes could be inquired into and should be counted for Judge Bambach.

As to the other of the disputed ballots, the presiding judge has some doubts as to whether they could be inquired into.

**Cherrington, J.,** concurs.

**JONES, J.**

I concur in the judgment by a plurality of thirteen only. It is undisputed that ten of the destroyed ballots were so marked for judge, that the judges of election were unable to count them for that office but counted them for the other offices. These were not sealed up but were destroyed without protest from a single judge; they became, therefore, counted ballots. The Ohio election laws having securely guarded the canvass of votes; provided for inspectors and bipartisan judges; stipulated that all disputed ballots shall be sealed up for "judicial review"; and

State v. Markley.

that all the ballots counted shall be destroyed, thus effacing the primary evidence of the voter's intention, I hold that parol evidence is not admissible to show how such ballots were marked. Any other rule would open the door to fraud and perjury. As to four other destroyed ballots, disputed by one or more judges who voted against their destruction, I am inclined to agree that oral testimony may be received showing how they were marked.

Tabulated statement of votes: Supervisor of elections counted for Judge Markley, 4,686 votes; supervisor of elections counted for Judge Bambach, 4,259 votes.

Votes for judge rejected: Markley—Byrd township, 61 votes; Mt. Oreb, 48 votes; Hamersville, 22 votes. Total rejected for Markley, 131 votes.

Bambach—Byrd, 142 votes; Mt. Oreb, 77 votes; Hamersville, 29 votes. Total rejected for Bambach, 248 votes.

Total for Markley on face of returns, 4,686 votes. Add number of rejected votes, 131 votes. Total as corrected, 4,817 votes.

Total for Bambach on face of returns, 4,259 votes. Add number of rejected votes, 248 votes. Total as corrected, 4,777 votes.

Deducting from Markley's vote of 4,817, thus corrected, the Bambach votes of 4,777, so corrected, leaves Markley over Bambach 40 votes.

Deduct four votes from Perry township counted for Markley leaves 36 votes for Markley over Bambach.

Disputed ballots: Markley now has over Bambach 36 votes; Union township Exb. B (9) of sealed ballots, 1 vote; Union township Exb. B (7) of sealed ballots, 1 vote; Union township Exb. B (6) of sealed ballots, 1 vote; Union township Exb. B (3) of sealed ballots, 1 vote; Hamersville Exb. K (1) of sealed ballots, 1 vote. Total 41 votes. Deduct eleven illegal infirmary votes leaves Markley 30 votes.

As to ten of the fourteen destroyed ballots, the presiding judge is doubtful as to whether testimony being introduced should be confined to those ballots concerning which there was a dispute among the judges, and that they should have certified.

Bambach votes: Ripley, A (2), 1; Ripley, A (3), 1; Ripley, A (4), 1; Ripley, A (5), 1; Ripley, A (6), 1; Ripley, A (8), 1; Ripley, A (11), 1; Ripley, A (13), 1; Ripley, A (15), 1; Ripley, A (16), 1; Ripley, A (17), 1; Ripley, A (18), 1; Ripley, A (19), 1; Ripley, A (12), 1; Ripley, B (11), 1; Ripley, B (10), 1; Ripley, B (8), 1; Ripley, B (5), 1; Ripley, B (4), 1; Ripley, B (2), 1; Ripley, B (1), 1; Franklin

### Brown County.

township, C (1), 1; Franklin township, C (2), 1; Huntington township, seven ballots all marked alike, 7; Aberdeen, I (6), 1; Aberdeen, I (5), 1; Aberdeen, I (3), 1; Aberdeen, I (2), 1; Jackson, G (2), 1; Hamersville, K (2), 1; Feesburg, H (1), 1; Washington township, F (1), 1; Russellville, E (1), 1; Clermont, North Franklin, L (1), 1.

Destroyed ballots: Higginsport, 3; Eagle, 4; Franklin, 3; Bardwell, 2; Jefferson township, 1; Washington township, 1. Total, 54.

Deduct from same, Smith, infirmary vote, 1; deduct Markley vote, 30; Bambach over Markley, 23 votes.

One, Higginsport, disputed; 2, Eagle; 1, Washington; 4 destroyed ballots.

This leaves Bambach over Markley twenty-three votes in the whole subdivision. A decree will be entered accordingly.