ARMBRUSTER, APPELLEE, *v.* CITY OF MIDDLETOWN, APPELLANT.

(No. 874—Decided March 8, 1944.)

*Mr. C. W. Elliott,* for appellee.
*Mr. Fred J. Schatzmann,* for appellant.

Matthews, J. This is an appeal from a judgment of the Common Pleas Court finding that the cause of removal of the plaintiff as a police officer of the city of Middletown was insufficient and for that reason setting aside the finding of the civil service commission of the city, affirming the action of the commission of the city, dismissing the plaintiff from his office.

The record shows that the plaintiff had been a member of the police department for ten years on September 23, 1942, when the chain of incidents, which was the predicate for his removal, began shortly after four o'clock in the morning. He testified that at that time he and Bryan Dineen, another police officer, were patrolling the streets in a certain district of the municipality when they noticed that the fire escapes on the building of the Eagles lodge in Eagle alley were not in proper position, in that they were down as though in use. That circumstance caused them to investigate. The plaintiff went up the fire escape and found a door, leading from the fire escape into an upper story of the building, slightly ajar. He was on the fire escape near the upper door and Dineen was in the alley near the lower end of the fire escape when Landon Webb, another police officer, came along and found them in that position. The plaintiff and Dineen told Webb what they had discovered and the three proceeded to enter and search the building. They found that the top sash of a window on the second floor was down, and that this window had no lock. They made a rather complete search of the lodge rooms, the bar and the refrigerator, but found nothing to indicate that any crime had been committed. They then closed the window, locked the door, descended the fire escape, and lifted the lower section of the fire escape so that it would not form an obstruction to travel. Plaintiff and Dineen together then proceeded on their task of patrolling

the streets, and Webb proceeded to join his companion officer in the vicinity.

Neither the plaintiff nor Dineen reported this incident to the police department until the chief of police, having learned about it from another source, called them before him on September 26, 1942, after 9:00 p. m., and questioned them, when they gave this version of the incident.

Webb testified about discovering plaintiff and Dineen in Eagle alley, that he went with them into the building and took part in the search, that everything seemed to be in order, that there was a bag of money in the refrigerator, that he left the refrigerator shortly before the plaintiff and Dineen did, and that as they were leaving the building plaintiff and Dineen said to him, "We did not find the place open, understand. And you keep your mouth shut." However, he reported the incident to officer Martz who was his superior.

Two employees of the Eagles lodge testified that, during the day of September 23, they discovered two quarts of whiskey, seven and one-half cartons of cigarettes and one flash light were missing, of the total value of between fourteen and fifteen dollars. This was reported to the police department, and officer Davis came to the lodge and made an inspection of the premises and advised that a lock be placed on the window. Officer Davis reported it and it was entered on the daily report sheet under the caption "Breaking and Entering." While there is some dispute as to when this entry was made, its position with reference to other entries seems to make it clear that it was entered on September 24.

The record makes it clear that there was a rule of long standing which made it the duty of police officers to report suspicious incidents coming to their attention while patrolling, and that these incidents were

placed in writing and kept where all officers could read them, and that it was the duty of all to read them.

The plaintiff and Dineen explained their silence on the subject by the statement that they considered the incident trivial, and that when they saw on the daily report sheet that a burglary of the same place on the same night had occurred, they thought too much time had elapsed to make their report of any value.

There was no arrest of any one on the charge of stealing the missing articles.

The chief of police recommended to the commission of the city—the appointing authority—that both the plaintiff and Dineen be discharged for incompetency, inefficiency, and gross neglect of duty; and after a hearing, the commission ordered their discharge on those grounds. Plaintiff and Dineen appealed to the civil service commission which, after a full hearing, found them guilty as charged, and that the penalty was not too severe; and it affirmed the action of the appointing authority in dismissing them.

The plaintiff and Dineen appealed to the Common Pleas Court, where the case was heard on the same evidence that was presented to the civil service commission. The court analyzed the evidence and concluded that "while the court cannot conclude but that such investigation disclosed sufficient facts to have been reported, yet certainly the slight infraction of not making such report would not be sufficient cause of removal, especially of one who had been in the service for some ten years without complaint." In conclusion the court found that the charge proven did not constitute sufficient cause for removal and reversed the decision of the civil service commission, affirming the action of the commission of the city made on the recommendation of the chief of police. That is the judgment from which this appeal was taken.

A fair statement of the cause of removal as disclosed by the evidence is that the plaintiff was guilty of a wilful and deliberate suppression of evidence tending to prove the unlawful breaking and entering of a building in the night season with intent to commit a crime. When we consider his reason for so doing, that it was not of sufficient importance for disclosure, in the light of the fact that both he and Dineen thought the circumstances to be suspicious enough to justify them in entering a private building in the night season, the invalidity of the excuse becomes apparent. Even though their search in the buliding failed to disclose any obvious evidence of crime, that did not neutralize the suspicious circumstances that caused them to embark on the scarch of the building. Furthermore, when they learned that a theft had been reported by the occupant of the building, the importance of the evidence possessed by them, if not previously realized, should have become so apparent as to be obvious to any one.

In view of the fact that the plaintiff had had ten years experience as a policeman and certainly knew the rule of the department requiring reports and should have known of the necessity of pooling all information even in absence of any express rule on the subject, the conclusion is inescapable that the suppression was the result of intent rather than an omission of innocence or mere neglect. Certainly, a reviewing tribunal, not having the advantage of seeing the plaintiff and witnesses, cannot say that the tribunal which did have that advantage was unreasonable in reaching such a conclusion. That is what the appointing authority found and that was the finding of the civil service commission.

On appeal to the Common Pleas Court from such a finding, the jurisdiction of that court, conferred by Section 486-17a, General Code, is limited to an inquiry

"to determine the sufficiency of the cause of removal."
While there have been differences in terminology in
phrasing the function of the court under this section,
there has been no difference in thought. The second
paragraph of the syllabus to *Kearns* v. *Sherrill, City
Manager,* 137 Ohio St., 468, 30 N. E. (2d), 805, is:

"The jurisdiction of the Court of Common Pleas in
such case is special and limited, by the terms of the
statute, 'to determine the sufficiency of the cause of
removal.' Where facts which constitute 'sufficiency of
the cause of removal' are established by the evidence
and found by the court, the trial judge may not arbi-
trarily reinstate such officer to his position and restore
his emoluments of office from the date of his discharge
on the ground that in his opinion the punishment pre-
scribed is too severe and he is without authority to
modify it."

And at page 472 the court said:

"Had it been intended by the law-making branch of
the government that the Common Pleas Court should
act as if 'sitting as the entire civil service commission
and also as the city manager,' as apparently was as-
sumed by the common pleas judge hearing the appeal,
the Legislature undoubtedly would have found it pos-
sible to employ language conferring such broad
power."

In the opinion of the Court of Appeals (63 Ohio
App., 533, 541, 27 N. E. (2d), 407) in the same case,
we find this:

"It is clear that the Common Pleas Court could not
have been vested with power in an original action to
exercise the executive or administrative discretion of
determining whether under all the circumstances the
patrolman should be retained in office, after it is de-
termined that good and sufficient cause for his removal
had been found to exist, and tested by that rule, it is

equally clear that it cannot be vested with such jurisdiction on appeal from an administrative tribunal." See, also, *State, ex rel. Stewart,* v. *Reed, Mayor,* No. 6324, Hamilton County Court of Appeals.

Now whether the hearing in the Common Pleas Court is described as a hearing *de novo* or otherwise, it is clear that its jurisdiction is "special and limited," and whether that special and limited character is imposed by the Constitution or the statute or both does not affect its extent. It does not include the function of "sitting as the entire civil service commission" and also as the appointing authority, either or both.

By Section 486-17*a,* General Code, incompetency, inefficiency, neglect of duty, or any other act of misfeasance, malfeasance, or nonfeasance in office are made grounds for removal. And it need not be evidenced by a course of conduct. One act or omission is sufficient. *State, ex rel. Hardesty,* v. *Wells, Dir.,* 121 Ohio St., 139, 167 N. E., 362.

We are of the opinion that the record shows substantial evidence of neglect of duty and nonfeasance in office; that there is no evidence that the appointing authority acted in bad faith or from any motive other than the enforcement of proper discipline in the department; that the civil service commission's finding that the appointing authority had sufficient cause for removal of the plaintiff is amply supported by the evidence; and that the Court of Common Pleas erred in reversing such finding.

For these reasons, the judgment of the Court of Common Pleas is reversed, and the finding of the civil service commission is affirmed.

*Judgment reversed.*

Ross, P. J., and Hildebrant, J., concur.

328

(No. 874—Decided May 19, 1944.)

ON REHEARING.

MATTHEWS, J. While the application for rehearing sets forth one ground, other than those based on *State, ex rel. Arey,* v. *Sherrill, City Manager,* 142 Ohio St., 574, 53 N. E. (2d), 501, upon which the plaintiff conceived he was entitled to a rehearing, the application was granted solely because it was fairly debatable whether that case did not require a conclusion contrary to that announced in this case. Suffice it to say as to the other ground that no new reason or authority has been presented and we adhere to the conclusion reached for the reasons set forth in our opinion. We shall confine this opinion to a consideration of the scope of the decision in the *Arey case* and the effect of its application to the facts of this case.

In the *Arey case* there was invoked the original jurisdiction in prohibition of the Supreme Court, to restrain the city manager of the city of Cincinnati from an alleged usurpation of power to hear and adjudge charges against a police officer of that city. The existence of the office of city manager was never challenged. The extent of his jurisdiction was the sole issue. The case was heard on the pleadings, in which it was alleged and admitted that there was an existing Cincinnati municipal government; that there was an office called city manager; that the respondent occupied that office; that there was a department of public safety administered by a director of public safety; and that the city manager was assuming to hear and determine the charges preferred against the relator by the chief of police.

On that record, the existence of the various offices was not an issue. The existence of the office of city

manager being admitted, the question was whether the respondent, as the incumbent of the office and under color thereof, was assuming to exercise an authority judicial in nature not lawfully attached to the office.

In contrast to that case in which the authority of the city manager was challenged, *in limine,* by a direct proceeding in prohibition, the plaintiff in this case submitted without protest to the jurisdiction of the city commission of the city of Middletown to hear the charges preferred against him, then appealed to the municipal civil service commission, and then to the Common Pleas Court. Only after a decision adverse to him by this court, on application for a rehearing, did he raise the issue of the jurisdiction of the city commission of Middletown and its civil service commission.

There is nothing in the majority or concurring opinion of the court in the *Arey case* that can be construed as showing an intent to strike down the entire municipal government, because the people had attached a power to one office thereof, which, in view of a conflict with a state law, could not, under Sections 3 and 7 of Article XVIII of the Constitution, be exercised by the incumbent, so long as the state law continued unrepealed. This is manifest from the entire tenor of the opinion and such a wide scope is excluded by the language of the sixth paragraph of the syllabus, which reads as follows:

"Where a charter of a municipality and an administrative code enacted under authority thereof grant to a municipal officer, called a city manager, power to appoint, dismiss, suspend and discipline all officers in the administrative service (which service includes members of the police department), such provisions in the charter and administrative code cannot prevail as against the provisions of the General Code; and a po-

lice officer, suspended for the claimed violation of certain rules of the police department, has a right to insist that the director of public safety inquire into the cause of such suspension and render judgment thereon regardless of such provision in the city charter or administrative code."

To assume that the Supreme Court entertained such a devastating purpose would attribute to it, an intent to overrule, without mention, a long line of prior decisions sustaining *de facto* officers against collateral attack.

If we take judicial notice of the entire framework of the municipal government, as we must do in order to conclude that this question is presented at all, we find that the people of Middletown have lived under this charter for more than thirty years and the state has never challenged its right during all of that time and, presumably, is satisfied to permit it to continue. Under such circumstances, has a private citizen, asserting a personal right and not assuming to act for the public, the capacity to question the *de facto* authority of the officers created by the people originally and acquiesced in for so many years? We think the Ohio authorities are clear that he has no such power.

Under the Constitution of 1802 there was no requirement that general laws should have a uniform operation throughout the state. There was no provision as to the manner of creating corporations or of conferring corporate powers. As a result, innumerable special acts granting corporate charters and conferring corporate power, and acts having only local application, were passed. The confusion thus created was regarded as a great evil and was one of the chief reasons for calling the convention of 1851, in which it was provided that no special act conferring corporate power should be passed; that corporations should be organ-

ized under general laws, subject to be repealed, altered, or amended at the pleasure of the Legislature; and that all laws of a general nature should have a uniform operation throughout the state.

Notwithstanding these sweeping provisions, the General Assembly, yielding to the insistence of the populous areas for local self-government, almost immediately devised a method of classification of municipalities, which it was hoped conformed to the Constitution, and by which the demand of specific localities could be satisfied. This classification was followed by laws, general in terms, applicable to all corporations of a given class. As time went on and the demands for special powers arose the classification statute was amended by increasing the divisions, so that by 1900 it was entirely possible to confer corporate power upon a single municipality, and it became the fashion to do so as to the more populous ones.

This method of constitutional evasion was never universally accepted. As was said by Judge Shauck, in *State, ex rel. Knisely,* v. *Jones,* 66 Ohio St., 453, 484, 64 N. E., 424, 90 Am. St. Rep., 592:

"That there has long been classification of the municipalities of the state is true. It is also true that while most of the acts conferring corporate powers upon separate municipalities by a classified description, instead of by name, have been passed without contest as to their validity, such classification was reluctantly held by this court to be permissible."

And while the general statute had been reluctantly acquiesced in, or at least, a condemnatory decision avoided, the court had declared specific statutes, predicated upon the classification, to be unconstitutional. *Costello* v. *Village of Wyoming,* 49 Ohio St., 202, 30 N. E., 613; *City of Cincinnati* v. *Steinkamp, Trustee,* 54 Ohio St., 284, 43 N. E., 490.

Encouraged by the state of the decisions as to the constitutionality of such statutes, the defendant in *State* v. *Gardner,* 54 Ohio St., 24, 42 N. E., 999, 31 L. R. A., 660, raised the constitutional issue as a defense to an indictment for offering a bribe to a commissioner of the city of Akron, a municipal corporation organized under a statute of the type later declared unconstitutional. He was discharged and, on proceedings in error, the Supreme Court sustained the exceptions of the state, on the ground that the constitutionality of an office could not be thus raised, collaterally. The subject was considered at great length. The conclusion is stated at page 33 of the opinion, as follows:

"We think that principle of public policy, declared by the English courts three centuries ago, which gave validity to the official acts of persons who intruded themselves into an office to which they had not been legally appointed, is as applicable to the conditions now presented as they were to the conditions that then confronted the English judiciary. We are not required to find a name by which officers are to be known, who have acted under a statute that has subsequently been declared unconstitutional, though we think such officers might aptly be called '*de facto* officers.' * * *

"Courts in the practical administration of justice should regard the substance of things and deal with conditions as they actually exist. Here are grave and important official acts actually performed by virtue of an office, created under the provisions of a statute regularly enacted by that branch of the government to which the power to make law has been delegated by the Constitution; there is a clearly established legal presumption of its validity. The public in its organized capacity as well as private citizens has acquiesced in and submitted to their authority."

What was said in that case is applicable with great-

er force to the facts in this case, in which the people have acted under clear constitutional authority. Only that part of the corporate structure created by them which comes into conflict with statutes can not be given effect, and even as to that part it remains capable of operation upon the removal of the statutory impediment.

The Supreme Court finally, in proceedings by the state in *State, ex rel. Knisely,* v. *Jones, supra,* and *State, ex rel. Atty. Genl.,* v. *Beacom,* 66 Ohio St., 491, 64 N. E., 427, 90 Am. St. Rep., 599, denounced as unconstitutional the conferring of corporate power based on classification. In the latter case it did not treat the existing offices based on the invalid conferring of power, as nonexisting. On the contrary, it suspended execution of its judgment for more than three months, so that the incumbents of such offices could continue to function until the Legislature could convene and properly remedy· the situation. And the *de facto* officers continued to act under the new law passed and their acts both before and after were never questioned.

In 28 Ohio Jurisprudence, 47, Section 16, it is said: "The doctrine of the *de facto* existence of corporations is applicable to municipal as well as to private corporations." See, also, 32 Ohio Jurisprudence, 1084, Section 230 *et seq.*

In *City of Albuquerque* v. *Water Supply Co.,* 24 N. M., 368, 174 P., 217, 5 A. L. R., 519, it was sought to invalidate the acts of officers of a municipality organized under an alleged unconstitutional statute, by the application of the aphorism, that there cannot be a *de facto* officer without a *de jure* office. The court rejected the contention, and, after an exhaustive discussion, held as stated in the syllabus:

"A municipal corporation, created under an unconstitutional charter, is a *de facto* corporation, and its

officers are *de facto* officers. The existence of the corporation, and its right to make contracts and transact business as such corporation, cannot be raised collaterally. The existence of such municipality can only be questioned by the state in a direct proceeding instituted by the Attorney General for that purpose, and until the question is thus raised, and an adjudication had, ousting the corporation from exercise of the franchise, all acts done and contracts made by the officers of such a *de facto* municipality are as valid and binding upon it and the property within its limits as though such officers were *de jure* officers of a *de jure* corporation.''

Much of the doubt and confusion on this subject has resulted from the sweeping language in the opinion in *Norton* v. *Shelby County,* 118 U. S., 425, 30 L. Ed., 178, 6 S. Ct., 1121. In refusing to follow it to its coldly logical conclusion, the Supreme Court, in *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S., 371, 374, 84 L. Ed., 329, 60 S. Ct., 317, said:

''The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. *Norton* v. *Shelby County,* 118 U. S., 425, 442; *Chicago, I. & L. Ry. Co.* v. *Hackett,* 228 U. S., 559, 566. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, pri-

vate and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination.''

Our conclusion is that the city of Middletown has a *de jure* corporate existence with authority to act through its officers in all respects, except where there is a conflict with existing statutes; that it has had a *de facto* government in all respects in accordance with its charter since its adoption in 1913; and that the *de jure* existence of the corporation, its offices and its officers can be determined only in a direct proceeding by the state, and are not an issue in an action involving private rights, as in this case. We find nothing in the *Arey case* that militates against this conclusion.

For these reasons, we adhere to our conclusion previously announced.

Ross, P. J., and Hildebrant, J., concur.