Juanita Jopling JENNINGS, et al., Appellants,

v.

WESSELY ENERGY CORPORATION, et al., Appellees.

No. 9491.

Court of Appeals of Texas, Texarkana.

Sept. 9, 1986.

Rehearing Denied Oct. 21, 1986.

H.P. Smead, Jr., Bill Parker, Smead, Anderson, Wilcox & Dunn, Longview, for appellants.

Michael V. Powell, Cynthia A. Keeley, Rain, Harrell, Emery, Young & Doke, Dallas, for AA Energy & Wessely Energy.

Rodney H. Lawson, Carrington, Coleman, Sloman & Blumenthal, Dallas, Howard Coghlan, Kenley, Boyland & Coghlan, Longview, for Beverly Ann Pearson Havner, et al.

BLEIL, Justice.

This is an appeal from a summary judgment. We reverse and remand for trial.

J.B. Orr owned 207.7 acres of land in Upshur County and, upon his death, the land passed by intestate succession in equal shares to his ten children. In 1954, the eldest brother, B.B. Orr, decided to buy the interests of his brothers and sisters; two deeds were executed, one from the heirs of R.D. Orr, the only deceased sibling, and one from the remaining heirs, including Minnie Pearl Orr Rainey. The essence of this controversy is the validity of Minnie Pearl's conveyance of her 1/10 interest to B.B. Orr.

At the time of her conveyance, Tex.Rev. Civ.Stat.Ann. art. 1299 (Vernon 1925) (repealed 1963) required that the husband join the wife in the conveyance of her separate property and that the instrument be acknowledged by the wife privily and apart from her husband. Minnie Pearl's husband did not join in her conveyance of her interest in the property.

After B.B. Orr's death, his estate gave Wessely Energy Corporation an oil and gas lease on the entire tract. Minnie Pearl died intestate and her husband later conveyed all his interest in the property to Juanita Jopling Jennings. This suit was brought by Jennings and the heirs of the other eight brothers and sisters of Minnie Pearl and B.B. Orr, appellants here, against Wessely Energy Corporation and other heirs and assignees of B.B. Orr.

Appellees moved for summary judgment alleging that Article 1299 was unconstitutional under U.S. Const. amend. XIV and Tex. Const. arts. I, § 3 and I, § 3a, and therefore that Minnie Pearl's conveyance was valid. This motion further alleged that the claims of all appellants other than Jennings were barred under the doctrine of after-acquired title. The trial court granted the motion for summary judgment on all grounds.

Appellants contend that since the conveyance from Minnie Pearl to B.B. Orr was void under Article 1299, Minnie Pearl did not convey her interest in the property and that her interest passed, upon her intestate death, one-half to her husband and one-half to her brothers and sisters under Tex.Prob. Code Ann. § 38(b)(2) (Vernon 1980).

All agree that were Article 1299 still in effect it would be unconstitutional by today's standards. *See Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

However, the law in effect at the time of a transaction governs that transac-

tion. Article 1299 was in effect at the time of the conveyance from Minnie Pearl to B.B. Orr in 1954. Appellees argue that since the statute was unconstitutional, it was void ab initio and should not govern. However, "the law in effect at the time of the transaction" refers to all laws, including the Constitution, and thus necessarily incorporates the contemporaneous interpretation of constitutional standards. Appellees do not assert that Article 1299 was unconstitutional under the constitutional interpretations prevailing in 1954. They allege that Article 1299 is unconstitutional under Tex. Const. art. I, § 3a, passed nine years after Article 1299's repeal in 1963. Appellees make no contention that U.S. Const. amend. XIV or Tex. Const. art. I, § 3 were applied to remedy gender discrimination in 1954.

Appellees argue, citing *Kirchberg v. Feenstra*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981), that Article 1299 can be found unconstitutional applying current constitutional analysis and this finding can be applied only to this case. However, *Kirchberg* is distinguishable for two reasons: first, the suit in *Kirchberg* was brought while the offending statute was still in effect, and second, the suit under the offending statute was brought in 1976, at a time when the existing statute was clearly unconstitutional under the existing law. Nothing about the *Kirchberg* decision would lead us to conclude that we should hold Article 1299 invalid ab initio and validate a transaction which was not valid in 1954, when Minnie Pearl gave the deed.

The position urged by appellees finds support grounded in the case of *Norton v. Shelby County*, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886), in which the Court stated that unconstitutional action:

> [C]onfers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.

However, the Court has long since abandoned this view and has rejected the notion of treating an unconstitutional statute as if it never existed. *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *Chicot Co. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Great Northern R. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). We decline to return to the long-abandoned *Norton* rationale and conclude that the law in effect in 1954, when Minnie Pearl gave the deed, governs that transaction and thus the trial court erred in granting a summary judgment.

■ Concerning the question of after-acquired title, the trial court's holding is predicated upon a finding that the deed executed by Minnie Pearl, whether valid or not, and by her eight siblings to B.B. Orr, was a general warranty deed. If this is the case, the heirs of the eight siblings would be unable to claim any title in the property since under the general warranty clause such title subsequently acquired by them would pass to B.B. Orr under the doctrine of after-acquired title (estoppel by deed). See *Duhig v. Peavy-Moore Lumber Co.*, 135 Tex. 503, 144 S.W.2d 878 (1940).

The 1954 deed by its language conveys "all our undivided interest" as owned by the grantors. Construction of this language would be that it conveys the property actually owned at the time of the conveyance rather than to extend to property which might be acquired in the future. See *Clark v. Gauntt*, 138 Tex. 558, 161 S.W.2d 270 (1942); *Roberts v. Corbett*, 265 S.W.2d 127 (Tex.Civ.App.-Galveston 1954, writ ref'd). And, although the warranty language of the deed contains covenants of a general warranty of title, the deed conveys only an undivided interest. Thus, the warranty does not apply to any after-acquired interest which was not granted; the warranty cannot vest in the grantee a greater estate than the deed itself conveyed. *Chace v. Gregg*, 88 Tex. 552, 32 S.W. 520 (1895), 5 F. Lange, *Land Titles and Title Examination* § 681 (Texas Practice 1961). Hence, since no future interest was con-

veyed, appellants cannot be estopped from claiming one. *Roberts v. Corbett*, supra.

Accordingly, the judgment of the trial court is reversed and the case remanded for trial.

CORNELIUS, Chief Justice, concurring.

I concur in the majority opinion and in the disposition of the appeal, but I write separately to elaborate upon the compelling reasons for concluding that the unconstitutionality of Tex.Rev.Civ.Stat.Ann. art. 1299 (Vernon 1925) (repealed 1963) should not be applied retroactively.

An extended discussion of the unconstitutionality of Article 1299 is neither necessary nor material. The dispositive issue in this case is not the constitutionality of that statute. There is no doubt about that—indeed, there is no argument about it. The adoption of Tex. Const. art. I, § 3a, as well as enlightened views of equal protection as guaranteed by the United States Constitution, long ago settled that question in a way gratifying to all of us. Rather, the issue in this case is whether the unconstitutionality of the statute should be applied retroactively to a fact situation prevailing thirty-two years ago, and in a manner that would create chaos by upsetting land titles based on the acts of persons who dealt in good faith reliance on the law as it existed at that time. The answer to that question is "no" for two very important reasons.

First, to apply Tex. Const. art. I, § 3a retroactively would violate both the United States Constitution's and the Texas Constitution's prohibitions against impairing the obligation of contracts.[1] For the purposes of those constitutional provisions, deeds are contracts, *Coolidge v. Long*, 282 U.S. 582, 51 S.Ct. 306, 75 L.Ed. 562 (1931); *Appleby v. New York*, 271 U.S. 364, 46 S.Ct. 569, 70 L.Ed. 992 (1926). And, the impairment clauses apply to state constitutional amendments as well as to state statutes. *Langever v. Miller*, 124 Tex. 80, 76 S.W.2d 1025 (1934); 16A C.J.S. *Constitutional Law* § 278 (1984), and cases there cited. Land conveyances are contractual in nature, and the law presumes that persons contract with reference to existing law. In fact, the material law in force when a deed or contract is executed is incorporated into the instrument and becomes a part of it. *Langever v. Miller*, supra; *Winder Bros. v. Sterling*, 118 Tex. 268, 12 S.W.2d 127 (1929); *Estate of Griffin v. Sumner*, 604 S.W.2d 221 (Tex.Civ.App.-San Antonio 1980, writ ref'd n.r.e.). If that law is later repealed, either by statute or by constitutional amendment, it nevertheless governs those transactions which were consummated pursuant to it, and the states are prohibited from applying the changed statute or amendment to impair those rights which have vested under the prior law and contracts. *Coolidge v. Long*, supra; *Appleby v. New York*, supra; *Langever v. Miller*, supra.

Second, although the equal protection clause of the United States Constitution[2] would undoubtedly render Article 1299 unconstitutional if that statute existed today, the statute's invalidity is not to be applied retroactively so as to disturb or abrogate vested rights. As said by the United States Supreme Court:

---

1. U.S. Const. art. I, § 10, cl. 1 provides:
   No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.
   Tex. Const. art. I, § 16 provides:
   No bill of attainder, ex post facto law, *retroactive law*, or any law impairing the obligation of contracts, shall be made. (Emphasis added.)

2. U.S. Const. amend. 14, § 1 provides:
   All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. *Norton v. Shelby County*, 118 US 425, 442, 30 L ed 178, 186, 6 S Ct 1121; .... It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of *rights claimed to have become vested,* of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination.... [I]t is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified. (Emphasis added.)

*Chicot Co. Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 84 L.Ed. 329, 60 S.Ct. 317 (1940). And again the court states: However appealing the logic of *Norton* may have been in the abstract, *its abandonment* reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our *modern decisions recognizing a doctrine of nonretroactivity.* Appellants offer no persuasive reason for confining the modern approach to those constitutional cases involving crim-

inal procedure or municipal bonds, and we ourselves perceive none. (Emphasis added.)

*Lemon v. Kurtzman,* 411 U.S. 192, 36 L.Ed.2d 151, 93 S.Ct. 1463 (1973). The Supreme Court and other courts of our nation have consistently refused to retroactively apply a holding of unconstitutionality, *even as to the contract or right in controversy,* when it would upset relations, titles or rights created in reliance on the statute during the time it was considered valid. These rulings have been applied to bonds and other securities issued or sold under statutes later held to be unconstitutional or otherwise invalid, *Cipriano v. Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *Chicot Co. Drainage Dist. v. Baxter State Bank,* supra; *County of Green v. Conness,* 109 U.S. 104, 3 S.Ct. 69, 27 L.Ed. 872 (1883); *Township of New Buffalo v. Cambria Iron Co.,* 105 U.S. 73, 15 Otto 73, 26 L.Ed. 1024 (1882); *Douglass v. Pike County,* 101 U.S. 677, 11 Otto 677, 25 L.Ed. 968 (1880), as well as to judgments, *Langever v. Miller,* supra; elections, *Allen v. Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), rights of inheritance, *Jackson v. Harris,* 43 F.2d 513 (10th Cir.1930), and rights to reimbursement for parochial school expenses, *Lemon v. Kurtzman,* supra. It is even more important that land titles remain settled and inviolate.[3] Although Minnie Pearl Rainey's deed itself did not convey or create any right, the application of Article 1299 to that conveyance affected subsequent conveyances and actions, resulting in vested rights and titles which should not now be defeated by a retroactive application of a finding that the statute according to present-day standards would be unconstitutional.

*Kirchberg v. Feenstra,* 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981), is not controlling here. In that case the Supreme Court expressly declined to pass on the propriety of a retroactive application of the

---

**3.** The vesting and settling of land titles is an important public policy consideration and goal of the law. *See, e.g., West v. Hapgood,* 169

S.W.2d 204 (Tex.Civ.App.-Fort Worth), *aff'd,* 141 Tex. 576, 174 S.W.2d 963 (1943).

decision because the question was not before it, and it chose merely to interpret the Court of Appeals decision as applying only to the mortgage actually in controversy. Moreover, the situation in *Kirchberg* was different from that here. It did not involve intervening rights of subsequent purchasers or innocent holders. Not only does the validity of Minnie Pearl Rainey's deed depend on our decision, but also the validity of subsequent conveyances and land titles created as a result of Article 1299's effect on her deed and in reliance on that statute.

For these additional reasons, I support the disposition of this case.

GRANT, Justice, concurring.

This case deals with a challenge to the constitutionality of a statute on the basis of gender discrimination. When the deed in question was executed, Texas had a statute, Tex.Rev.Civ.Stat.Ann. art. 1299 (Vernon 1925) (repealed 1963), which required a married woman, even though conveying her separate property, to be joined by her husband in any conveyance.[1] No similar statute required the joinder of the wife in a conveyance by the husband.

The first statute requiring the husband to join the wife in a conveyance of her separate property was enacted in 1841, followed by another enactment in 1846. These were patterned after Spanish laws which required the husband's assent to convey her property. *Allen v. Urquhart*, 19 Tex. 480 (1857).

In 1957, legislation was passed which permitted a wife to elect to have the sole management, control, and disposition of her separate property and required the husband to join in a conveyance or encumbrance of land only if the wife does not so elect.[2] This legislation sought to repeal existing laws so far as they were in conflict with the new statute. In 1963, the offend-ing statute was repealed by the Texas Legislature.

One of the most valuable incidents of the right of property is the power to dispose of it. *Ballard v. Carmichael*, 83 Tex. 355, 18 S.W. 734 (1892). In the case of *Spann v. City of Dallas*, 111 Tex. 350, 235 S.W. 513 (1921), the Court expounds upon this basic right as follows:

> The ancient and established maxims of Anglo-Saxon law which protect these fundamental rights in the use, enjoyment and disposal of private property, are but the outgrowth of the long and arduous experience of mankind. They embody a painful, tragic history—the record of the struggle against tyranny, the overseership of prefects and the overlordship of kings and nobles, when nothing so well bespoke the serfdom of the subject as his incapability to own property. They proclaim the freedom of men from those odious despotisms, their liberty to earn and possess their own, to deal with it, to use it and dispose of it, not at the behest of a master, but in the manner that befits free men.

Yet Article 1299 placed a limitation on the right of married women to dispose of their property. Even if the Legislature believed that women needed such protection, this law is contradictory of that rationale, because no restriction was imposed on single women. *Ballard v. Carmichael*, supra.

There are those who contend that constitutional interpretation should be limited solely to the intentions of the framers of the Constitution or to the understanding of its meaning by the original ratifiers. The drafters of the United States Constitution did not wish to place the status quo in concrete. This document constituting our government laid down fundamental princi-

---

1. "It is provided by statute that if the husband be insane or shall have permanently abandoned his wife, or shall refuse to join in an encumbrance, conveyance, or transfer of the wife's separate property, his joinder may be dispensed with by leave of court." E. Oakes, Speer's Marital Rights in Texas § 553 (4th ed. 1961).

2. E. Oakes, Speer's Marital Rights in Texas § 544 (4th ed. 1961), citing Tex.Rev.Civ.Stat. Ann. art. 4614 (amended 1957) (repealed 1970).

ples to guide us into eras not contemplated by its authors. To believe that we could or should try to apply the intentions of the original framers to every modern day problem confronting us is to believe that we have magical powers to communicate over a span of two centuries and is to go beyond the expectations of the framers. It is its inherent ambiguity which has enabled the United States Constitution to endure with few amendments. The concept for the need of adaptation to social progress and social circumstance is not a jurisprudential idea formulated by jurists of the present era, but has been long recognized as a vital principle of constitutional law. This same principle of construction applies to interpreting the Texas Constitution.

Certainly our view of legal rights today and the idea that there is a need for special protection of women in business transactions would make Article 1299, as it existed in 1954, an absurdity which clearly would not meet constitutional standards.

Over the past three decades, there has been much progress in the recognition of women's rights. In 1961, President John F. Kennedy, finding that "prejudices and outmoded customs act as barriers to the full realization of women's basic rights," set up the Commission on the Status of Women. This Commission recommended that an application of the Fifth and Fourteenth Amendments be made to end official practices discriminating against women.

The Congressional branch and the executive branch of the federal government have acted to eliminate discrimination based on "stereotyped characterizations of the sexes." *Phillips v. Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971).

The courts found that discrimination on the basis of sex could no longer be justified by relying on "[O]utdated images ... of women as peculiarly delicate and impressionable creatures in need of protection from the rough and tumble of unvarnished humanity." *Seidenberg v. McSorleys' Old Ale House, Inc.*, 317 F.Supp. 593 (S.D.N.Y. 1970).

The United States Supreme Court demonstrated that sex-based classifications would be struck down under the equal protection clause when they provided dissimilar treatment for men and women who are similarly situated with respect to the object of the classification. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

In the case of *Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529 (Cal.1971), the California Supreme Court addressed gender discrimination:

> Laws which disable women from full participation in the political, business and economic arenas are often characterized as "protective" and beneficial.... The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage.

In the case of *Kirchberg v. Feenstra*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981), the United States Supreme Court struck down a Louisiana statute which made the husband "head and master" of property held jointly with his wife. At the time of that decision, the Louisiana Legislature had already repealed that law.

The case of *Stokes v. Stokes*, 613 S.W.2d 372 (Ark.1981), is an example of an unconstitutional gender-based classification. In that case, the State of Arkansas gave a widower dower rights in the property of a deceased spouse and the right to take against the will of the deceased spouse. This did not comply with the equal protection clause because the widower was denied this right.

To withstand a constitutional challenge under the equal protection clause of the Fourteenth Amendment, the classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). If a state statute impinges upon the fundamental freedoms protected by the Constitution, the statutory classification under the equal rights protection clause must be not merely rationally related to a valid public purpose, but also necessary to the achievement of a

compelling state interest. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Article 1299 is clearly unconstitutional violating both U.S. Const. amend. XIV and Tex. Const. art. I, § 3. Tex. Const. art. I, § 3a was not adopted by the citizens of the State until November 7, 1972; therefore, this constitutional amendment could not apply to the transactions involved in this case.

The general rule is that an unconstitutional statute, though having the form and structure of law, is in reality no law but is wholly void. *Miller v. Davis*, 136 Tex. 299, 150 S.W.2d 973 (1941). However, as pointed out in the other concurring opinion, the courts recognize that there is often reliance on a statute even though it is unconstitutional. Article 1299 was not challenged in our appellate courts during its existence, so we must determine the retroactive effect of now declaring the statute unconstitutional. All cases have a retroactive effect from the time the case reaches finality in the court system back to the time of the occurrence, but in the present case the matter had lain dormant for a number of years until the title to the land became an issue.

The Constitution neither prohibits nor requires retrospective effect for a new constitutional application. *Tehan v. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). The choice between retroactivity and nonretroactivity must hinge upon the peculiar traits of the specific rule in question. Annot., *Supreme Court Decisions—Retroactivity*, 65 L.Ed.2d 1219 (1981). While many of the United States Supreme Court decisions involving retroactive and nonretroactive application have been in the area of criminal law, the rationale behind determining retroactive or nonretroactive effect pertains to decisions outside the criminal area. *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

A significant factor in deciding retroactive effect is whether or not it is necessary to effect the purpose of the ruling. *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In the instant case, we cannot erase the fact that women of this State were required for more than a century to get their husbands' signatures to sell their property. We can say that such an unfair requirement will no longer be sanctioned in the future.

In the case of *Chevron Oil Co. v. Huson*, supra, the Supreme Court held that to be applied nonretroactively, a judicial decision must establish a new principle law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Where a decision will produce substantial inequitable results if applied retroactively, there is ample basis for avoiding the injustice or hardship by a holding of nonretroactivity.

The Supreme Court held in *England v. Louisiana Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), that their ruling would not be retroactive and would not apply to the parties in that case.

I do not believe that a retroactive ruling in the instant case would cause chaos in the land titles of this State, because the vast majority of the conveyances in the years of Article 1299's existence complied with that article. However, a retroactivity application would affect vested rights in situations such as the present case in which Juanita Jopling Jennings relied upon the statute in making a purchase from Minnie Pearl's husband on November 5, 1965.

I therefore concur with Justice Cornelius on the nonretroactive application.

## ON MOTION FOR REHEARING

As one of the bases of their motion for rehearing, appellees state that judicial decisions do not violate the impairment of contracts clause of the United States Constitution. We agree and have not said otherwise. It has long been recognized that the impairment clause does not apply to judicial decisions declaring a law invalid. What we said in our opinion, and said very

plainly, was that *the amendment to the Texas Constitution* (Article I, § 3a), if applied retroactively as appellees urged, would violate the impairment clause, and "the states are prohibited from applying the *changed statute or amendment* to impair those rights which have vested under the prior law and contracts." (Emphasis added.) We refused to retroactively apply our *decision* that Article 1299 was unconstitutional, because of the other reasons set out in our opinions for refusing to do so.