The majority opinion concedes that the financial instruments in question have most of the attributes of bonds. However, it seems to conclude that they are not bonds, simply because they are non-negotiable under the law of commercial paper, and therefore are not within the operation of § 222, because § 222 refers only to bonds. Rather than blindly relying on the law of commercial paper to control whether the instrument in question is a "bond," as that word is used in § 222, I would look to the context in which the word was used and to the intent and purpose of § 222.
I must acknowledge, before I begin this inquiry, that there are statements in some cases that arguably support a narrow construction of § 222:
 "It certainly cannot be affirmed that the purpose of the Constitution was to prohibit the creation of city indebtedness without an election. There is nothing in the Constitution to prohibit the creation of debts to the limit which it fixes, without the sanction of such election. The Constitution, § 222, only checks the issuance of a certain form of security for that debt, but not the creation of the debt. It has been held not to prohibit the issuance of warrants, under seal, though interest bearing and due over a period of years. Littlejohn v. Littlejohn, [195 Ala. 614, 71 So. 448]; Ramage, Parks Co. v. Folmar, 219 Ala. 142, 121 So. 504."
Parsons v. City of Birmingham, 223 Ala. 610, 611, 137 So. 665,666 (1931). However, neither Parsons nor Littlejohn v.Littlejohn, 195 Ala. 614, 71 So. 448 (1914), pays homage to an analysis based upon form over substance. In both cases, the court conducts an inquiry into the essential features of the instruments at issue before concluding that they do not fall within the operation of § 222.
Other cases make it clear that one of the key features bringing an instrument into the ambit of § 222 is that it create a general obligation, that is, one backed by the general tax revenues of the municipality. Opinion of the Justices No.
26, 226 Ala. 570, *Page 1301 148 So. 111 (1933); Fuller v. City of Cullman, 240 Ala. 309,199 So. 2 (1940); Opinion of the Justices No. 108.252 Ala. 583, 42 So.2d 348 (1949). Fuller also emphasized the propriety of putting substance over form and looking to the purpose of the constitutional provision at issue:
 "In deciding whether a given proposition is in violation of a constitutional limitation, such as here referred to, the result attempted to be brought about by what is proposed is the prime consideration, and the controlling test to it is to be found by regarding substance rather than form, in looking at its practical operation and effect when considered in the light of constitutional restrictions against improvident borrowing which the organic law obviously intended to impose in the premises. Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432."
Id., 240 Ala. at 314, 199 So. at 6.
Fuller and the two opinions of the Justices previously cited involved application of both § 222 and § 225. Those sections and § 104(17), preventing the legislature from passing a local law authorizing political subdivisions of the state to issue "bonds or other securities" without there first being an election, are obviously related. They were on occasion discussed together during the deliberations giving rise to the Constitution of 1901:
 "I wish to take up the time of the Convention long enough to read a short item from a paper prepared by the Honorable Bird S. Coler, Comptroller of New York City, who is a high authority upon all questions pertaining to municipal indebtedness. He says:
 " 'I wish to state clearly my appreciation of, and adherence to, the wisdom of constitutional restrictions on the indebtedness of cities. These restrictions are to be found in the Constitutions of nearly all our states, and have been upheld both in letter and in spirit by the decisions of our courts. They have undoubtedly served to prevent the financial ruin of many small cities, which in the hands of unscrupulous political adventurers would otherwise have undergone disastrous experiences. Yet this constitutional limitation has itself its limitations. It should not be made a fetish to be worshipped blindly at the expense of really necessary progress.
 " '[In] the competition which exists today between nations and cities, as well as between individuals, to stand still means to retrograde, and if it should happen that a choice must be made between stopping the modernization of New York and amending the Constitution, I am in favor of the latter course, provided no real danger to the city's credit and solvency be thereby threatened.
 " 'I believe the clause in the Constitution limiting municipal indebtedness — wholly admirable at the time it was written — is not altogether adapted to modern requirements, in that it does not discriminate sufficiently between two classes of city debts of a wholly different character.
 " 'A city issues bonds only for permanent improvements, the benefits of which inure to posterity. But there are two classes of these improvements, easily distinguishable from one another, and between which a sharp distinction should be drawn.
 " 'In one of these classes are improvements which, while adding to the attractiveness, beauty, and healthfulness of a city, to its economical administration, or to the better conduct of its governmental functions, bring in no direct financial returns. This is by the erection of public buildings, including schools, the acquisition of parks, and the repaving of streets. No matter how great the material benefits may be that are derived from such improvements, the expense incurred is unquestionably a financial burden upon the taxpayers. In regard to such expenditures there can be no doubt as to the wisdom of establishing an arbitrary constitutional limit, since otherwise the burdens that might be thrown upon succeeding generations by excessive issues of bonds would become intolerable.
 " 'There is another class of improvements, however, far less common, which *Page 1302 
either result in casting no burdens whatever upon the taxpayers or else bring in an actual profit to the municipality. In such cases it may be permissible to ask wherein there lies any rational excuse for limiting the governmental activities of a city by constitutional restrictions. A dim recognition of this truth seems already to have found expression in the Constitution of New York, which partially excepts from the operation of the debt limitation bonds issued to provide for the supply of waste and requires only that a special sinking fund be established for their ultimate redemption. Why this exception? Because pure water is a prime necessity for the health of a community? Scarcely, for there are many other public necessities paid for by the issue of bonds which are hardly less imperatively needed by the people, and as to such [the] Constitution is silent. The reason must be found in the fact that for the past century, by a universal custom which has the force of unquestioned law, it has been the practice of cities owning waterworks to charge consumers for the water supplied, and that the rentals received from the operation of this natural monopoly have almost invariably shown a profit over the expense of maintenance and operation. In other words, bonds issued to provide for the supply of water are not a real burden upon the taxpayers, since the water rents received pay the interest on these bonds, amortize the principal, and still yield a profit to the city.'
 "Summing up the result of this article, the author says:
 " 'Our constitutions should be amended so as to except from the limitation on the indebtedness of cities bonds issued to provide for improvements — which, while governmental in their character are, nevertheless, essentially business enterprises — and from the operation of which profits can be derived sufficient to provide a speedy payment of the indebtedness temporarily incurred.' "
Official Proceedings, Constitutional Convention (Alabama), 1901 pp. 1513-15.
A spirited discussion followed, during which various limitations on indebtedness were discussed. At one point, Mr. Knox commented:
 "There is another clause in the Article reported by the Committee on Municipal Corporations which restricts the issue of bonds, except by a vote of the city that makes it. That is a sufficient limitation, and we should not make an iron-clad rule that will hamper our cities in the future. I move the previous question."
Constitutional Proceedings at 1588. Eventually the present version of § 225, with different limitations on general debt and debt for water works, gas or electric plants, and sewage and street construction, emerged.
The Convention heard from the Committee on Local Legislation before it acted on the recommendations of the Committee on Municipal Corporations. The Committee, in a report that eventually led to § 104(17), proposed to restrict the legislature from passing laws authorizing local bond issues. It was noted: "[It would] be practically impossible to dispose advantageously of municipal bonds without the sanction of the General Assembly in each specific case. . . . We know that when we come to issue bonds, it is not only necessary to have authority to issue them, but it is necessary to have the authority to do so in such a manner as to make them attractive to investors." Constitutional Proceedings at 1853.
A view contrary to that of involving the legislature was expressed by Mr. Watts: "The object of the including of this provision in this report is not an account of the issue of bonds by any town or city, but simply to keep the legislature from taking the public time in passing a special law in each particular case." Constitutional Proceedings at 1855.
The remarks of several delegates on the proposal of the Committee on Local Legislation reflect the interplay between § 104(17), § 222, and § 225:
 "MR. O'NEAL — One of the greatest evils in Alabama has been the unlimited issue of bonds by the counties and municipalities of this State. If you take the *Page 1303 
record of the last few Legislatures you will find that over eight millions of indebtedness have been created. The result has been that the people of Alabama have demanded that the power of the Legislature to issue these bonds shall be curtailed. They have demanded that before any city or town in Alabama, or county, shall have the privilege of issuing bonds, that the question shall be submitted to a vote of that particular locality that may be affected. Then if a law of that kind is passed and it has been reported by the Committee on Municipal Corporations, a general law will be passed on the subject, requiring every city, county and town in Alabama before they issue a bond, to submit the question to a vote of the people [of] the particular locality that will be affected.
 "The Legislature will pass a law prescribing the terms in the bonds. They can provide that the rate of interest at which the bonds shall be issued, shall be determined by an ordinance of the particular town or city affected. They can provide that when the bond issue is authorized, that fact can be certified to the Secretary of State by the Mayor or Probate Judge, and what more evidence would a bond buyer want than that certificate? You have that certificate to show the election of a Governor. You have it to show the election of every official in this State, and why should we go to the bondholder or to the bond-buyer with more evidence than we give upon the election of the most important officials in this State?
 "Now I say if you strike out this provision you leave it in the power of the Legislature to authorize the issuance of bonds, in any town, city or county in the State, absolutely without restriction or limitation. You allow the local member to come to Montgomery without consulting his constituents, without seeking to know their wishes in regard to the issuance of bonds, he secures the issuance of bonds in any amount that may suit his pleasure and the people are without remedy.
 "MR LONG. (Walker) — Is it not a fact that a limitation was placed upon the power of counties and municipalities to issue bonds in one of the other reports?
 "MR. O'NEAL — It is not a fact, as I understand it. There was nothing in the report of the Committee on Taxation on this subject which has ever been adopted by this Convention. There is only a limitation in the report of the Committee on Taxation that no city or town shall exceed 7 per cent of the assessed value of its property and there is a limitation upon the rate of taxation, but there has been no limitation upon the power otherwise.
 "MR. BOONE — I read to you from the report of the Committee on Municipal Corporations:
 " 'Sec. 7. No county, city, town, village, district or other political subdivision of a county shall have authority or be authorized by the General Assembly after the ratification of this Constitution to issue bonds, unless such issue of bonds shall have first been approved by majority vote by ballot of the qualified voters of such county, city, town, village, district, or other political sub-division of a county voting upon such proposition. In determining the result of any election held for this purpose, no vote shall be counted as an affirmative vote which does not show on its face that such vote was cast in approval of such issue of bonds.' "
Constitutional Proceedings at 1857-58.
By the time the Convention actually took up § 7 of the report of the Committee on Municipal Corporations, most of the discussion centered on whether female property owners should be able to vote in bond elections.
I cite the lengthy discussions from the constitutional proceedings not to affirmatively show what the framers intended by using the word "bonds" in § 222 but rather to show that the framers did not discuss what was to be included within the term "bonds." It is interesting to note that the Constitution both affirmatively authorizes the issuance of bonds upon the vote of the *Page 1304 
people of the municipality in § 222 and prohibits the legislature from passing local laws authorizing the issuance of "bonds or other securities" without an election by the voters in the municipality, § 104(17).
Because I find no hint in these discussions that the word "bond" was used as the result of a deliberate attempt to restrict the issuance of only an instrument that has the strict technical requirements of a bond, it is appropriate to examine the question of whether the lack of negotiability, the element the majority concludes is fatally lacking, should remove the instruments involved in the present case from the requirements of § 222.
I have difficulty in following the rationale of the majority with respect to negotiability and the "holder in due course" issue. First, while these instruments may not be technically negotiable, they are freely transferable and assignable, although transfer or assignment is accomplished only upon surrender to the depository for cancellation and the reissuance of a new instrument of like tenor. The majority concludes that the transferee cannot be a holder in due course and, therefore, would be subject to all defenses of the obligor. However, the ordinance, as well as the instrument itself, provides that the indebtedness "is lawfullydue without condition, abatement or offset of any description."
The mandate of a constitutional provision should not be so easily circumvented by a technical statutory requirement that has no practical effect in this setting. Holder-in-due-course status has a significant effect where the subsequent holder is protected from defenses of the original obligor. In the instant case, there are no defenses that could be asserted against a subsequent holder that could not be asserted against a holder in due course. In other words, a subsequent holder's position would be no better, even if he had holder-in-due-course status.
Therefore, I conclude that § 222 required that an election be held before these instruments could be issued.
Although I believe the instruments at issue are subject to the requirements of § 222, I would apply this decision quasi-prospectively. The Alabama Bankers Association and the Alabama Security Dealers Association, in an amicus curiae brief, contend:
 "The retroactive application of a decision invalidating the Hoover Warrants could cast doubt on the validity of all warrants issued prior to the entry of the decision in this case (the "Prior Warrants") and could deprive innocent warrant holders of vested rights, create great confusion among Alabama local governments, increase the cost to Alabama local governments of borrowing money and generate additional litigation. Moreover, retroactive application of this decision would not advance or uphold any of the purposes of the electoral requirements of Section 222. Thus, any holding which might affect the validity of Prior Warrants should not be applied retroactively."
In Stallworth v. Hicks, 434 So.2d 229 (Ala. 1983), we refused to apply retroactively a prior decision that changed the law of homestead to meet a constitutional challenge. In doing so, we cited with approval Chicot County Drainage District v. BaxterState Bank, 308 U.S. 371, 374, 60 S.Ct. 317, 318-19,84 L.Ed. 329 (1940):
 "The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. Norton v. Shelby County, 118 U.S. 425, 442 [6 S.Ct. 1121, 1125, 30 L.Ed. 178]; Chicago, I. L. Ry. Co. v. Hackett, 228 U.S. 559, 566 [33 S.Ct. 581, 584, 57 L.Ed. 966]. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of *Page 1305 
the subsequent ruling as to invalidity may have to be considered in various aspects, — with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified."
I believe that consideration of the factors set forth above lead to the conclusion that my position on the requirements of § 222, if it had prevailed, should not be applied retroactively. See State ex rel. Washington State FinanceCommittee v. Martin, 62 Wn.2d 645, 384 P.2d 833 (1963), wherein the Washington Supreme Court refused to retroactively apply a decision holding that limited obligation bonds were subject to a constitutional debt limit.
As previously stated, however, I would apply the decision quasi-prospectively.
 "Quasi-prospective overruling, like prospectivity, protects reliance on prior rules by applying the overruling decision to acts done or transactions consummated after the effective date of the decision. Unlike prospective overruling, however, when a court overrules quasi-prospectively, it affords relief to the instant parties. The major justifications for using quasi-prospective overruling are two-fold: first, to make an announcement binding precedent rather than mere dictum; and second, to reward successful appellants and thereby provide an incentive for litigants to challenge existing rules of law that are in need of reform."
33 Ala.L.Rev. 463, 473 (1982). This case was brought pursuant to Code 1975, § 6-6-750 et seq., which set up a mechanism for establishing, before issuance, the validity of a proposed obligation. While the result of my position might have, if it had been the majority position, caused the municipality some inconvenience, because the obligation has not yet been issued the reliance factor is insignificant in comparison to the purposes to be served by § 222.
ALMON, J., concurs.